HIGHLAND GLASS CO. v. SCHMERTZ WIRE GLASS CO. et al.

(Circuit Court of Appeals, Third Circuit. February 16, 1910. Supplemental Opinion, June 8, 1910.)

No. 91 (1,311).

1. PATENTS (§ 174*)—INFRINGEMENT—PROCESS AND MECHANISM FOR MAKING WIRE GLASS.

The Schmertz reissue patent, No. 12,443 (original No. 791,216), for an apparatus and process for manufacturing wire glass, is for an improvement on the so-called "European" or two-sheet method of making wire glass, and consists in the simultaneity of laying the wire and rolling the first sheet and the close and progressive following of the second roll casting the second sheet on top thereof. This quickening of the whole operation produces a better welding of the two sheets and an improved result, but the claims, being for an improvement only in the respect stated, must be limited to the simultaneity of the particular method and the particular mechanical means for practicing it described in the specification, and cannot be broadened to include other methods or means for accomplishing the same result. As so construed and limited, held not infringed.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 249; Dec. Dig. § 174.*]

2. COURTS (§ 407*)—APPEAL FROM INTERLOCUTORY DECREE GRANTING INJUNCTION IN PATENT CAUSE—SCOPE.

Where an interlocutory decree in a suit for infringement of a patent adjudges the patent valid and infringed, awards an injunction, and directs an accounting under Act March 3, 1891, c. 517, § 7, 26 Stat. 828 (U. S. Comp. St. 1901, p. 550), authorizing an appeal from an order or decree granting or continuing an injunction, an appeal may be taken from the whole of such decree, and the Circuit Court of Appeals has authority to consider and decide the case on the merits, not only with respect to the patent infringement of which was enjoined, but also as to another, infringement of which was charged but not determined by the lower court, and may render or direct a final decree dismissing the bill as to both.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1100; Dec. Dig. § 407.*]

3. PATENTS (§ 328*)—INFRINGEMENT—PROCESS AND MECHANISM FOR MAKING WIRE GLASS.

The Schmertz patent, No. 791,217, for an apparatus and process for manufacturing wire glass, construed, and held not infringed.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suit in equity by the Schmertz Wire Glass Company and the Mississippi Wire Glass Company against the Highland Glass Company. Decree for complainants, and defendant appeals. Reversed.

The following is the opinion of the Circuit Court, by Buffington, Circuit Judge:

This is a bill in equity filed by the Schmertz Wire Glass Company and the Mississippi Wire Glass Company against the Highland Glass Company. It charges infringement of claims 1, 2, 6, and 7 of Schmertz's reissue patent No. 12,443 of January 30, 1906 (original patent No. 791,216 of May 30. 1905), and claims 1, 2, 3, and 4 of same patent No. 791,217 of May 30, 1905. The defenses are invalidity of both patents and noninfringement. These patents have been before this court in several cases and their validity decreed. As a discussion of the art and the questions affecting the validity of the patents is reported in the opinion of this court at 168 Fed. 73, we refrain from restating the same in this case and content ourselves with making such opinion part hereof by reference. Since the filing thereof these patents were before the Circuit Court of the Northern District of Illinois, and in an opinion reported in 178 Fed. 977, Judge Sanborn stated they have been considered by this court and "the patents held valid and meritorious. With this conclusion I agree." We will therefore in the present case dispose of the validity of the patents on our opinion already filed and confine ourselves to the question of infringement. On this question the respondent plants itself on the proposition that its process—which to aid in reference we call the Highland process—is what has been called through all this litigation the European process. Following this leading, we will in this opinion confine ourselves to two propositions, namely: First, that the Highland process is not the European process; and, secondly, that the Highland process is the process of Schmertz.

To determine what a particular process really is, two things must be considered and ascertained: First, the process means; and, second, the process product. In the former case we ascertained, after a full examination, these features of the European process and such process means and process product are thus described: "Through this protracted litigation we have seen no reason to change the view we took of Schmertz's process when it first came before us in Schmertz v. Appert (C. C.) 144 Fed. 117, where we said: 'Appert and Schmertz seem to have been working at substantially the same period in developing the wire glass process; the former in France and the latter in America. It related to casting rough plate glass for skylight and other purposes, having a wire mesh embedded in the center. This had been done by what is known as the "European method," which consisted in first casting the lower part of the plate, then placing the wire mesh upon it, then casting the upper part thereon. The difficulty with that process was that the plate when finished consisted of two separate strata, the lower of which had so far congealed or solidified before the upper half was cast that the two would not unite and form a homogeneous whole. The result was they separated and split.'" This in brief space, is the European process. The means were such that the lower half "had so far congealed or solidified before the upper half was cast that the two would not unite and form a homogeneous whole." The product was such that the parts "separated and split." The reason for this is quite plain. Within a short space of time after molten glass is poured and rolled, there forms upon it a glazed or congealed surface. This is known as its "skin." When once the "skin" is formed, it fixes, so to speak, the individuality of the plate. If thereafter another mass of molten glass is poured upon the "skinned" surface of the first while the two may be pressed and indeed welded together, they do not unite so as to form a homogeneous whole. This was what the European or sandwich method of making wire glass was. The sandwich consisted of an upper and lower layer, so separated by a congealed skin or skins that in effect they remained two layers. This was the European process as worked, and this was all its users developed.

So much for the means used in the process. As to its product, the effect of the nonhomogeneity of the sandwich make-up was such that when the plate was subjected to the heat variations incident to annealing, the two skin sepa-

178 F.—60

rated sections asserted their individuality in the different stress and strain incident to glass and under such stress and strain fractured. This is well stated by Leon Appert, an experienced French glass manufacturer, who in the specifications of his American patent, No. 608,096, said: "The importance and value for various purposes of glass reinforced by a metallic trellis of network embodied therein are well understood and need not here be set forth. It has therefore been very desirable to discover a process which, while admitting of the production of such articles under conditions analogous to those attending the manufacture of ordinary wire glass, and consequently at a moderate price, would preserve all the essential qualities of limpidity and transparency of the glass without reducing resistance or increasing its fragility. Attempts in this direction were made in 1886, when it was proposed to place a metallic trellis or network between two glass plates and unite the latter. That attempt, however, was unsuccessful, as the product possessed neither homogeneity nor cohesion." '

It will thus be seen that the European process never proved practical or commercial, that it left no impress on the art, and neither in earlier nor later times was it practically worked. It is true it was experimented on for years and was tenaciously clung to by those who sought to solve the problem of making wire glass, for it seemed the natural and simple way to do so. To this we referred in the opinion cited, saying: "Now, the first thought in connection with this art is that, when the idea of making glass is once suggested, the manufacture must be very simple. In other words, that the inventive thought, if one exists, consists in the conception of wire glass. Casting tables, and rollers for smoothing glass are old. The casting of sheets of rough glass is obviously simple and grinding and polishing a developed process. What, then, more simple than to cast a sheet, then lay a net of wire netting upon it and on the two pour and cast a second sheet? And that such should be the first impression is quite natural, for this was the idea and practice of the whole glass art, and it found expression in the patent development of three foreign countries and in the name, 'European process.' But experience, as we shall see, proved that this seemingly simple method did not and could not produce wire glass, and that even rough wire glass was only a hoped-for product." Indeed, the European process was considered by the Circuit Court of Appeals of the Eighth Circuit in Streator v. Wire Glass Company, 97 Fed. 950, 38 C. C. A. 573, and, speaking of it in connection with the Shuman process (a later development), Mr. Justice Brown said: "The Shuman patent was evidently the first practical method of making wire glass." And Judge Jenkins in a concurring opinion, said: "Others * * * had conceived the thought of wire glass and provided certain means for the manufacture; but they never achieved success, or pointed out any practical means for its accomplishment. There was no wire glass in use or upon the market, either in Europe or in this country, when Shuman obtained his patent." These judicial findings that the prior wire glass art, which included the European or sandwich process, was simply theory, produced no practical result and put no wire glass in use or on the market, simply embodied in judicial opinion, the estimate of the commercial world as will fully appear by reference to the citations from the proceedings of the Franklin Institute of Philadelphia, extracts from the Iron Age, the Scientific American, the Paris Revue Industrielle, the Encyclopedia Brittanica, and the Wonders of Modern Mechanism, cited in our prior opinion.

The European process therefore being a failure, it is clear that the Highland process, which, in direct antithesis, produces a plate which "when finished (did not) consist of two separate strata, the lower of which had (not) so far congealed or solidified before the upper half was cast that the two would (instead of would not) unite and form a homogeneous whole," and "the result was that it did (not) separate or split"—is not the European process. Indeed, it goes without argument that two such radically different results spring from radically different moving causes. Theoretically the Highland and the European processes to a degree resemble each other, as indeed all processes of making wire glass must ex necessitate resemble each other, in that at some time during any one of such processes three different factors are provided, viz., an upper and lower layer of glass and an intermediate layer of wire; but in the method of uniting these factors there is in the Highland and

European processes, in spite of formal resemblances, the fundamental and vital difference between success and failure, and this unquestioned fact of failure in the European and success in the Highland practice results so far as the glass is concerned from the fact of plate homogeneity, which is the case in the Highland plate, and nonhomogeneity, which is the fact in the European plate. And the plate homogeneity in the Highland practice results from the simultaneity of the steps of such practice.

Now, let there be no misunderstanding or word quibbling in this vital and essential feature of this case. When the words "simultaneous," "synchronism," and "simultaneity" are used in connection with an operation which consists of casting and rolling two large sections of molten glass and introducing a web of fragile wire between, it is physically clear that these three operations cannot be literally and absolutely simultaneous. It is therefore manifest that when we refer to such a series of operations as simultaneous, or when the Patent Office defines them as simultaneous, we and they are not literally accurate for acts are only literally, absolutely simultaneous when they all happen at the same precise instant, but the acts in making wire glass are, as stated in our opinion, of a "practically synchronous or simultaneous character." In getting to the gist of a patent, what was really disclosed, and what the Office meant to protect, we must go beyond the literature of dictionary definitions and from the context, from the failure of the prior art, and the successful device or process disclosed, ascertain the actual meaning of words used to describe what was invented. For words must be treated as agencies to find, not to lose the novel, practical, useful device or process given to the public. And in that connection we refer to Blair v. Jeannette (C. C.) 161 Fed. 355; Manville v. Excelsior Needle Co., 167 Fed. 533, 93 C. C. A. 216; Malignani v. Germania Co. (C. C.) 169 Fed. 299; and Fullerton v. Anderson, 166 Fed. 443, 92 C. C. A. 295—where it was held that the word "immediately," in a claim "immediately plunging the nuts into the solution," was answered by plunging them within 20 minutes; the court saying: "The force of these considerations becomes apparent when it is considered that in the actual operation of the appellee's invention it is not practicable to plunge the nuts into the bleaching solution at the very instant of the addition of the acid. Even if the protection of the patent is to be limited to coincident immersion, the interim should receive a reasonable interpretation, and should be held to mean an immersion of the nuts in the bleaching solution practically at the time when the acid is added and while it continues to accomplish the result of releasing the nascent chlorin. It is shown in evidence that acetic acid accomplished that result for a period of 20 minutes, during which time, in the practical operation of the process, crates of nuts are consecutively dipped and allowed to remain for the space of a few seconds. Any immersion of the nuts during the space of time during which that reaction is taking place, it is reasonable to say, is an immersion coincident with the addition of the acid."

Now, when this large record is boiled down to the crucial point, it will be seen that the vital point in making a single plate from two pours is, so far as the glass is concerned, simultaneity of operation. Time is of the essence of the operation. And synchronism, practical simultaneity is the life which the Highland process has imparted to lifeless, fruitless European process. And if the reasoning of the last case we have cited be correct—and we hold it is—that in case of a simple immersion bath which required no delay in giving, the term "immediate" was answered by 20 minutes because during that time the results disclosed by the patent could be obtained, what shall be said of the contention that in a complicated operation, involving the handling of great pots of molten glass and delicate webs of fragile wire, the space of 15 to 18—not minutes but seconds—makes the process nonsimultaneous. In making a two-roll plate, time is measured, not by the seconds used, but by the effect of time on the molten glass in forming a skin. The necessity of forestalling by seconds this skin formation is incidentally under the terms "slightly quicker than nature" and "before the bottom shall become stiff a shade too soon," but all the more forcibly testified to in a letter by one of respondent's officers to his counsel, wherein he strikes the crux of the operation of making a homogeneous plate by a two-pour rolling in saying: "You ap-

preciate we are working in seconds of time, and things must be done to a nicety to accomplish good results." Now, in this Highland practice, we have the almost incredible result that in from 14 to 18 seconds there is a completed operation of workmen pouring a great mass of molten glass on a casting table, mechanically advancing a highly heated roller over it, following this by a second roller on which a wire trellis is laid, of getting the wire web out of the way of a second pour and passing over it a third roller. That this operation of making a finished plate is completed in that time shows a rapidity of sequence that we think is aptly described as simultaneous, and that it is practical simultaneity is, we think, conceded virtually by the fact that the practice could be still speeded higher, but that would bring it infringingly near a literal simultaneity. Indeed, that the several steps are virtually and functionally synchronous is shown by the fact that no time intervenes between the steps in which the glass of the lower section can congeal, skin, or become stiff, as it did in the European process, and prevent the formation of a homogeneous whole. Such instantaneous rapidity of sequence has no prototype in the European process. It is simply not found, taught, or practiced in it, and we are therefore fully justified in saying the Highland practice is not the European process. And the reason why it is not is because it has simultaneity and because it has simultaneity it gets homogeneity of product.

The Highland Company therefore not being able to shield itself as a mere user of the European process, it remains to consider whether it has appropriated the process of the Schmertz patents. In view of the discussion in our prior opinion of that process and of its creation of the commercial wire plate industry, we refrain from a repetition thereof and simply restate therefrom our conclusion. We there said: "The length of this opinion precludes a statement in detail of the benefits arising from the introduction of this new article (wire plate) which our reading of the entire record has disclosed. An examination of the prior art in the record has further satisfied us that Schmertz first disclosed the process and apparatus by which the remarkable development of wire glass plate came about. The effective feature of Schmertz's process is the practically synchronous or simultaneous character of his differently recessed two-roll, two-sheet process, coupled with a successful wire feed. Molten glass responds very quickly to changes in heat conditions, and such changes render impossible results which might have been obtained an instant before. * * * Schmertz obtained his product by an apparatus adapted to effectuate such a synchronous process and a perfect feed, and a study of the various patents satisfies us that none of the various prior patentees disclosed in the making of wire glass the necessity of simultaneous treatment, which in connection, be it observed, with suitable mechanism to effectuate both it and a perfect feed, made Schmertz's process successful. These essential features in combination are lacking in the alleged anticipation."

Now to us it is clear that the Highland practice has appropriated the Schmertz process. The first claim of reissue No. 12,443 is "the process of making glass sheets with wire inclosed therein, consisting in simultaneously forming a layer of glass and introducing wire thereto and completing the sheet by forming another layer upon the first layer of glass; the process being carried on progressively." Now the Schmertz process is simultaneous and progressive. So also is the Highland. Indeed, it relatively more closely approximates literal simultaneity than Schmertz's, in that the whole Highland operation is finished in a shorter time than that in which Schmertz showed a practical means of operating his process and which the Patent Office described by the word "simultaneous." It is also functionally simultaneous, in that it effects homogeneity which, up to this time, has only been obtained by the simultaneity of the Schmertz process. It is, however, contended that the Highland practice simply applies modern mechanism to the European process, and it is argued that this the respondents are first to do. Passing by the fact that a continuous tank furnace, an overhead trolley system for glass haulage, and roll driving by clutch attachment, have all come into the glass art comparatively lately, and were not in use when the European process was the attempted way to make wire glass, it suffices to say that such reasoning would nullify every patent. While it is true the respondents are perfectly free to practice the European process, and while they are perfectly free to use

their own mechanical appliances, they are not free to use those elements, or any other, in working the process of Schmertz's claims. These they have done and have infringed the claims charged of Schmertz's reissue patent.

As this determination of these primary underlying questions of process suffices to warrant making final the injunction heretofore granted in this case, we are not impelled to lengthen this opinion by a discussion of the claims of the other patent as a basis of a decree.

A decree may therefore be drawn in which both patents as to the claims involved be adjudged valid, and that the four claims on the reissue patent are infringed, and such infringement be enjoined.

Charles Neave and William G. McKnight, for appellant.

Arthur J. Baldwin, William L. Pierce, and Drury W. Cooper, for appellees.

Before GRAY and LANNING, Circuit Judges, and McPHERSON, District Judge.

GRAY, Circuit Judge. This is an appeal from the decree of the court below in a suit in equity, in which the Schmertz Wire Glass Company and the Mississippi Wire Glass Company were complainants, and the Highland Glass Company, the appellant, was defendant.

The suit is based upon the infringement charged in the bill upon claims 1, 2, 6, and 7 of the Schmertz reissue patent No. 12,443, dated January 30, 1906 (original patent No. 791,216, dated May 30, 1905), and claims 1, 2, 3, and 4 of Schmertz patent No. 791,217, issued May 30, 1905. Each patent relates to an apparatus and process for making wire glass. By the decree of the court below, the patents were held to be valid with respect to all the claims relied upon, and the defendant's process and apparatus were held to infringe all of the claims that were relied upon in the Schmertz reissue patent (viz., claims 1, 2, 6, and 7), and a permanent injunction was ordered to issue with reference to those claims, but not with reference to the claims of the patent No. 791,217, as the court did not decide the question of infringement arising under that patent.

The defenses urged in the court below, and presented for consideration here, are:

First, that the reissue patent was not infringed.

Second, that the patents are void for lack of patentable novelty and lack of invention, in view of the prior art of making wire glass.

Third, that the patents in suit are void, because the applications therefor and the alleged inventions purporting to be covered by them were abandoned.

Fourth, that the patents are void, because one Appert, not Schmertz, was the original and first inventor.

Appert's claim to priority of invention was the source of a complicated and long drawn out litigation, the history of which, though interesting and pertinent to some of the defenses, in the view we take of the case need only be briefly summarized.

The two applications, which finally resulted in the patents in suit, were filed in the Patent Office in March and April, 1895, respectively, and both of the applications were rejected on the French patent to Appert, No. 233,528, dated January 12, 1894, the application for which was filed October 19, 1893, and the Patent Office stated that this

French patent described a process and apparatus substantially identical with that described and claimed in the Schmertz applications.

Appert filed, on April 27, 1894, an application for patent in the United States Patent Office, the specification of which was substantially a literal translation of his French patent; Schmertz was notified of a probable interference and of the fact that in order to contest with Appert the question of priority of invention he must, under the provisions of rule 75 of the Patent Office, file an affidavit setting forth facts, if any existed, showing that the invention was completed at a date prior to the date of the French patent. Schmertz thereupon filed affidavits in which he swore that:

"He completed the invention in this country, * * * before October 19, 1893, the date of letters patent of France to Appert, No. 233,528."

Then, on May 28, 1896, an interference was declared between the applications of Schmertz and Appert.

The Examiner of Interferences, June 7, 1897, awarded priority of invention to Appert. From this judgment an appeal was taken to the Examiners in Chief, who, August 13, 1897, reversed the judgment of the Examiner of Interferences and priority was awarded to Schmertz. From this judgment an appeal was taken by Appert to the commissioner, who, April 18, 1898, affirmed the decision of the Examiners in Chief. Appert then appealed from the decision of the Commissioner of Patents to the Court of Appeals for the District of Columbia, by which court the decision appealed from was reversed, and the priority of invention awarded to Appert and the proceedings certified to the Commissioner of Patents. In accordance with such certificate, and in due course, on July 26, 1898, the United States Patent Office granted to Appert letters patent No. 608,096, which patent is for the alleged invention covered by the Schmertz patents now in suit. On August 8, 1898, Appert brought suit in the Western District of Pennsylvania against Schmertz, who had been engaged since the spring of 1895 in the manufacture of wire glass by the process described in his application, and against his company, the Brownsville Plate Glass Company, for infringement of the Appert patent. On October 3, 1898, Schmertz filed in that suit a cross-bill against Appert, under section 4915 of the Revised Statues (U. S. Comp. St. 1901, p. 3392) in which it was alleged that he, and not Appert, was the prior inventor of the process and apparatus described in their respective applications and interferences, and sought a decree authorizing the Commissioner of Patents to issue a patent to Schmertz. On October 20, 1898, Schmertz died, and the cross-bill suit, abated by Schmertz's death, remained dormant until a cross-bill in the nature of a bill of revivor and supplement was filed February 11, 1903, by the Schmertz Wire Glass Company, which had theretofore become the owner, by certain mesne assignments, of all the rights of the said Schmertz, deceased, in his said inventions and applications for patents therefor. On April 5, 1901, the Mississippi Wire Glass Company acquired title to the Appert patent, and Appert and the Appert Wire Glass Company no longer were interested in the suit which was thereafter conducted against the Schmertz Wire Glass Company in the interest of the Mississippi Com-

pany. The Mississippi Company, having opposed the granting leave to file the bill of revivor above referred to, after it had been granted, to wit, March 27, 1903, became owner of the Schmertz applications, through the purchase of the Schmertz Wire Glass Company and the Brownsville Company.

From this time onward, the litigation on both sides was conducted by the Mississippi Wire Glass Company, its double interest in this respect being openly avowed and recognized by the court. The situation was peculiar. Whether priority should be awarded by the court to the Schmertz claim or the Appert claim, the Mississippi Company would own the successful claim. There was this difference, however: If the Appert patent won, the monopoly of the Mississippi Company under it would expire on April 14, 1908, with the expiration of the prior British patent. If the Schmertz patent won, the same monopoly would be continued in the Mississippi Company to the end of the term of these patents, which would not expire until 1922. Such being the situation, the taking of testimony was proceeded with on both sides, counsel on both sides having entered into a stipulation confining the controversy to the sole issue of priority of invention, and excluding any "formal and alleged bar." The case was argued, and the opinion of the court was filed September 30, 1904, awarding priority of invention to Schmertz. The decree of the court was sent to the Commissioner of Patents, October 11, 1904, and after the time for appeal had expired, on May 30, 1905, the Schmertz patents were issued. When Schmertz patent, No. 791,216, was issued, it was found that it did not contain the claims which constituted the issue of the interference between Schmertz and Appert, and, under the provisions of section 1916 of the Revised Statutes (U. S. Comp. St. 1901, p. 3393), it was reissued, containing those claims, as No. 12,443, which is one of the patents in suit.

After the issuance of these patents, the Circuit Court for the Western District of Pennsylvania (the same court as the court below in the present suit), in a suit against the Pittsburgh Plate Glass Company, considered, and on final hearing sustained, the validity of the patents, and held infringement by the particular device of the defendants in that suit. It appears, also, from a statement in the brief of the appellees, that there was a decision of Judge Sanborn, sitting in the Circuit Court at Chicago, upholding the validity of the Schmertz patents, in a suit against the Western Glass Company. No citation is given, but we have since seen a typewritten copy of the opinion referred to, which was delivered upon the refusal of the court to grant a motion for a preliminary injunction. The learned judge of the court below thus refers to it:

"Since the filing thereof [the opinion in the case of Schmertz Wire Glass Co. v. Pittsburgh Plate Glass Co.], these patents were before the Circuit Court of the Northern District of Illinois, and in an opinion reported in 178 Fed. 977, Judge Sanborn stated they have been considered by this court and the 'patents held valid and meritorious. With this conclusion I agree.'"

The learned judge of the court below then says:

"We will, therefore, in the present case dispose of the validity of the patents on our opinion already filed, and confine ourselves to the question of infringement."

Confining ourselves also to this question, we pass to its consideration, without expressing any opinion as to the other defenses that have been urged in the argument before us, viz., the alleged lack of patentable novelty and lack of invention, in view of the prior art, in making wire glass, the alleged priority of invention of Appert to Schmertz, and the alleged abandonment of the applications for said patents, and the inventions purporting to be covered thereby. We assume, therefore, for our present purposes, the validity of these patents. It will suffice to consider the claims of the reissue patent, as it was with reference to these claims alone that the permanent injunction was ordered to issue in the court below, no infringement having been decreed as to the second of the original patents, the claims of which differed only in an immaterial respect from those of the first patent.

A brief reference to the prior art will be necessary to enable us to understand what is the real invention covered by the patents in suit, as set forth in the specifications and claims thereof. Schmertz did not, as he could not, claim to be the inventor of wire glass, or of its manufacture. The recognition of an existing art is clearly stated in the specifications of both patents. The conception of a web of wire, centrally imbedded midway between the two surfaces of a plate of glass, whether rolled or moulded, was quite old, and no claim has been made for the monopoly of such a product. Methods by which this conception could be realized had been suggested in the disclosures of more than one published patent, and practiced long prior to the date of the patents in suit, although the result had not been entirely satisfactory or commercially successful, owing to causes that will appear on a more critical examination of the prior art. What was a common feature of the prior art has been conveniently characterized as the "European method." As such, it was known to both Appert and Schmertz, and was recognized by the learned judge of the court below as well known before the date of the patents in suit.

The art of rolling glass into plates of a predetermined thickness, by casting the molten glass upon a steel table and passing a roller over it, upon trangs so arranged as to elevate the roller at the distance above the table required by the thickness of the finished plate, had long been practiced in this country and abroad. This is illustrated by the British patent to Pettit, issued as early as 1850, where certain figures and specifications show and describe a casting table, with a co-operating roll, the table being mounted on wheels or rollers, in order that it may be moved under the roll, which in this instance is stationary and adjustable in its height above the surface of the table. This patent also describes a stationary casting table, with the roll moving along its upper surface. Counsel for appellant calls attention to a description of figure 7 of this patent, as showing that at that early date, it was usual to provide the table with racks to engage the pinions on the ends of the roller. We quote from the specifications of the patent, as follows:

"Figure 7 is a side elevation of a casting table, showing a method of employing guides for giving steadiness to the roller, in place of the racks and pinions now usually employed. A, A, is part of the framework of the casting table; B, one of the guides which are attached to the frame of the table by means of regulating screws; C, the roller for spreading out the glass into a plate or sheet, and D, the chain by which the roller is drawn over the table."

This description is also referred to, to show that at this early date, "spreading out the glass" was a familiar expression applied to the process of casting a sheet of glass by means of a roller upon a casting table. Another patent cited by appellant, describing the casting table and the operation of rolling out the molten glass or "metal," is the British patent to Lockhead and Passenger, of 1852. This patent describes a table made of steel or other suitable material, on which the metal is rolled. The table is mounted on a carriage, while the roller is placed tranversely, with its axis working in fixed vertical bearings.

"The upper surface of the table is furnished on each of its longitudinal sides with racks, in which work the teeth of the wheels, S, of the cylinder, the weight being supported by the raised circular bands, t, t, or with metal sidings of the required thickness, and also with such guides as may be deemed advisable, under particular circumstances, to secure the different thicknesses of metal and parallel edges to the rolled metal.

"The metal is thus passed between the moving table and the stationary cylinder, and thus becomes rolled; or the roller may be movable.

"The metal is first flattened on a table by a roller, as already described."

It is then suggested that a second roller may be used, with teeth or projections to press holes or indentations into the sheet that has been rolled. The use of metal strips or trangs is also shown in this patent, to sustain the weight of the roller and determine the thickness of the glass being rolled. It also suggests, in place of metal trangs, the placing upon the ends of the roll of raised bands or collars, for the support of the roll, at the required distance above the table, and also guides to be used to secure the desired width of the rolled plate. This well-known use of the casting table and its appurtenances is also shown in the United States letters patent to Carpenter, No. 185,428 (1876), for "An improvement in processes for casting glass plate." The patentee says in his specifications:

"In carrying out my invention, the melted glass is poured on a casting slab. A roller then forms the glass into a plate in the usual manner. As soon as the roller commences to flatten the melted glass into a plate, I apply a body of metal over the glass plate, which rapidly cools its upper surface about equal to the cooling that the lower side of the plate gets by being in contact with the casting slab.

"I do not claim the process of pouring the glass on the casting slab and forming it into a plate by a roller, as that is old and well known."

In the Kayll (British) patent of 1878, the specification begins as follows:

"This invention has for its object improvements in the manufacture of rolled rough plate glass.

"Heretofore, rolled rough plate glass has been produced by ladling or pouring molten glass on to a metal table and spreading it evenly by passing a roller over it, straight fillets or strips of metal being secured along the surface of the table upon which a roller travels, and according to the thickness of which the substance of the glass is determined."

After describing this theretofore well-known method of spreading molten glass upon a table, by passing a roller over it, the patentee goes on to speak of certain longitudinal lines produced on the surface of the table by the planing tool used in its formation, which made their impression on the sheets of glass. These defects he proposes to obviate by the method and machine of his patent. This machine becomes in-

teresting, as part of the prior art in the present case, and is thus described by the patentee:

"In order that my invention may be clearly understood I have shown in the drawing hereto annexed a machine such as is used in the manufacture of rolled rough plate glass, but having the table formed with parallel lines across instead of lengthwise of its face.

"Figure 1 is a plan view, and Figure 2 a side view of the machine. A, is the bed or table with parallel lines across its face. B, is a roller upon two straight fillets, C, secured along the surface of the table. D, D, are guides which rest upon the table in front of the roller and serve to limit the width of the sheet of glass produced; they can be set at any required distance apart, according to the width of sheet required. At each end of the roller are hand wheels, E, by which it can be turned and caused to roll along the table; at the end of the roller are also two toothed pinions, F, which gear with toothed racks formed along the side of the frame which carries the table, A. These racks and pinions serve to keep the roller correctly in position across the table."

An examination of the United States patents to Walsh, No. 346,695 (1886), Brogan and Mallock, No. 370,177, and No. 370,178 (1887), and Chance, No. 359,128 (1887), also discloses the fact that the patentees of these patents were dealing with mere improvements in a well-known art of rolling plates of glass of a predetermined thickness, by means of casting tables and cylindrical rollers, with their various appurtenances for moving the rolls or the tables and supporting the rollers at the required distance from the surface of the table. These citations show that the art of spreading glass by one or more rollers, upon casting tables of the same general character and structure as those now in use, together with the same appurtenances of racks, trangs, collars, and guides, has been well known for more than half a century. In several of these patents, the use of a second roller for impressing upon the surface of the sheet formed by the first roller indentations or ornamental designs, is made part of the process described.

It was to those skilled in this well-established art of rolling glass into plates upon casting tables, with one or more rollers, that the suggestion of making wire glass naturally came, after its value as a variety of rolled plate glass began to be appreciated. It is unnecessary to dwell upon the early date at which the conception of a plate of glass with a metallic web in its center, equidistant from its two surfaces, was conceived, as in the British patent to Dolier, in 1838, or in the British patent to Newton of 1855. It is interesting, however, to note in the last-named patent, that though there is an absence of casting table and rollers, the process is as follows:

"The mode of procedure to produce this new manufacture (which is shown in the accompanying drawing in face view at Fig. 1, and in cross-section at Fig. 2) is to take the moulds used for moulding glass, of the size required, and drop molten glass into such moulds in quantity about half as much as would produce the required thickness. This will spread in the mould by gravity. A sheet of wire cloth of the required size is placed upon the first layer of glass, and on top of this another proportion of molten glass is placed, and the whole subjected to pressure in the usual way; and under this pressure, the two masses of glass being in a highly heated state, the required form is given to the mass, while at the same time the two masses are caused to unite around the metallic wire, so that the metallic netting becomes the bond by which the brittleness of the glass acquires the capacity to resist heavy blows and the action of intense heat."

As the uses for which wire glass was available became more apparent, it is not surprising to find that those familiar with the art of rolling glass acted upon the obvious suggestion that a web of wire might be laid upon a molten sheet of rolled glass and imbedded in it by the action of a second roller, as described in the British patent to Armstrong of 1887. The patent says:

"The object of this invention is to insert wire work into the interior sheets of glass while being rolled. This is performed by the method adopted in the ordinary way of rolling sheet or plate glass with a roller and table and an additional apparatus combined to insert the wire."

In this method, the wire is fed over the leading roller simultaneously with the spreading of the glass. It is perfectly apparent, from examining the figure in this patent, together with the description of the process, that the wire is introduced over the leading roll, which presses it down into the molten glass, so that the glass comes up through the meshes of the wire, and that then follows the large roller, rolling the sheet down into the required thickness, and pressing down the glass that has come through the meshes, so as to form a smooth covering of the wire, which is thus imbedded into the interior of the sheet. It is impossible to escape the suggestion here, of simultaneity in the introduction of the wire and the rolling of the sheet, as well as of the single sheet, one-pour process of the Shuman patent, which will hereafter be noticed.

What inevitably followed in the attempt to make wire glass, was the two-pour, two-sheet process, in which a molten sheet of glass is first rolled on the table to a fraction of the required thickness of the plate to be formed, and upon this sheet, when completed, the wire is laid, and then a second pour is rolled out over the wire, imbedding it evenly between the two sheets thus cast. This is the so-called "European method," to which we have above referred.

Descriptions of the essential character of this process, in certain letters patent, are referred to by the defendant, as in the German patent to Tenner, patented from May 18, 1888. The process is described, as follows:

"A quantity of molten glass, which suffices to produce half of the thickness of the desired plate, is cast into a suitable form and then rolled and pressed. On this is laid the metal interlayer, preferably consisting of a metal layer or metal netting, then there is cast on this the required quantity of glass to produce the required thickness, and the whole is rolled and pressed and finally tempered. * * * The durable glass material thus produced can be advantageously employed for top lights, cellar windows, fireproof partition walls, etc., and especially for such cases in which it is a question of admitting light with sufficient security against incidental or intentional breakage. * * * This glass cracks in consequence of too great a heat, but the separate pieces remain in connection with one another, so that dropping apart is prevented, notwithstanding the fact that it is broken."

It is to be noted that some of the qualities claimed for the wire glass made by this process, and the uses to which it may be put, are among those for which wire glass is especially sought at the present time.

. Again, in the German periodical "Keramische Rundschau," of the issue of November, 1893, is an article on Hard Glass and Wire Glass. It opens by saying:

"For a long time, writes the 'Bauindustrie Zeitung,' it has been tried in vain to give glass a greater resistance capacity, and especially for building purposes, until it has become finally possible by the invention of the hard glass and of the wire glass to open the way to new progress."

Further on, the manufacture of wire glass is thus described:

"Wire glass consists of a glass mass, which, in the liquid or plastic condition, is provided with an inter-layer of wire or wire grating or netting, so that the inner layer is completely covered by the glass, and the rusting of the wire is therefore impossible. For the manufacture of a wire glass plate, a quantity of molten glass, which is about sufficient to produce half of the thickness of the desired plate, is rolled out, the wire netting is laid on the same, and the still needed glass mass is poured on, rolled out, and then tempered."

It is likely that the writer of the article from which the above quotation is made, had in mind, among others, the French patent to Becoulet and Bellet, of 1886, disclosing essentially the same method of manufacturing wire glass, by imbedding wire netting between two layers of molten glass, as is described in said article. The process of this patent is thus set forth:

"The present request for a patent has for its object the securing for us of the exclusive ownership of a new product, consisting of glass to be used for windows in the body of which we place a mesh of iron wire, or a mesh of any other metal or material in such manner that if the plate of glass is broken, the pieces will not fall out, but will remain united among themselves, retained by the metallic mesh which forms one body with them.

"To obtain this result we spread out upon a table a layer of molten glass, equal to half the thickness which the finished plate of glass is to have; then we place upon the same a mesh of iron wire previously cleaned, the size of which varies as the case may be, and we cover this mesh by another layer of glass over which we pass a roller.

"It is very evident, moreover, that this method of manufacture can be varied without in any way changing the nature of our invention.

"At the end of these operations we obtain a plate of glass perfectly homogeneous, in the mass of which is found caught a metallic mesh which is thoroughly incorporated in the same.

"According to the requirements, the product so obtained can be used in the rough state, or in a polished state.

"These products may be employed in the construction of all kinds of windows, of shops, of greenhouses, casement windows, and roofs over courts, and generally in all cases where the pieces of glass from the breaking of one or two plates, could offer any danger whatever."

In this patent, the claim is for a product, as well as for the means for producing it. Owing to the state of the art at the date of this patent, the language, "we spread out upon a table a layer of molten glass, equal to half the thickness which the finished plate of glass is to have," may well imply the use of a roller in this spreading out process, as rollers were well known as available for that purpose.

In the British patent to Lake in the same year, 1886, we find this statement:

"In carrying the said invention into practice, a layer of fused glass of half the thickness which the finished plate is to have, is spread upon a table. Upon this layer is placed a grating of iron wires, or the like, previously polished, the thickness of which grating varies according to circumstances. This grating is then covered with a fresh layer of glass over which a roller is passed.

"By these operations, a perfectly homogeneous glass plate is obtained, with which is incorporated a metallic net work, or grating, which forms a body with the glass.

"It is evident that the mode of manufacture can vary without departing from the nature of this invention.

"The product obtained can be employed in a raw state, or be polished as required.

"The plates can be used in the construction of windows, workshops, greenhouses, or roofs, generally, in any case where danger may arise through breakage."

This patent states that the provisional specification from which we have quoted was communicated from abroad by Becoulet and Bellet, patentees of the French patent above referred to.

In the British patent to Hyatt, granted in 1874, which covers a great many devices for use in the construction of buildings and ships, we find the following disclosure:

"According to another part of my invention for making fireproof glass I make a plate or rolled glass with a netting of wire incorporated in the body of the plate, one mode of doing this being as follows: I use two drums or rollers, as is done sometimes in making ornamental face glass, one behind the other. The former carries a wrap or web of wire netting, which as it rolls down the 'metal' is spread out upon the face of the flattened mass; but this 'metal' is only half of what is needed to make the sheet. Another dumping of another mass is made immediately upon the first flattened sheet with its overlaying of wire netting, the second mass falling upon the wire netting, where it is met by the second or following roller and flattened out, thus incorporating the wire sheet between two plates of glass welded together."

This being the state of the art, two United States patents were granted to one Shuman, September 20, 1892, being Nos. 483,020, and 483,021, for a machine for imbedding wire netting in glass, and for a process of imbedding wire netting in glass, respectively. In the one, he speaks of having "invented an improved machine for imbedding wire netting in glass," and in the other, of having "invented an improved process" for doing the same thing. We append hereto, with the description of the process contained in the specification, Figure 3 of the Schuman patent:

"In carrying out my process I pour sufficient molten glass upon the table at the point, a. The carriage is then moved in the direction of its arrow, and the roller C smooths out the molten glass to the proper thickness, after which the wire or wire gauze is placed upon the molten glass and pressed into it by the roller D. The roller E follows the roller D and closes the opening made by the wire and the roller D. By this means a sheet of glass is rolled having imbedded within it strips of wire or a sheet of wire gauze."

FIG. 3.

It then says that the roller, D, may have a series of annular ribs upon it, which indent the wire into the molten glass, which is forced up through the interstices of the web, to be rolled out flat by the following smooth roller, E. This is a one-pour process, the single pour being made in front of the first smooth roller, and the wire delivered down a chute in front of the second roller. Shuman's process was carried on in this country with some success. Shuman testified in the interference proceedings between Schmertz and Appert, that prior to the date of his patent, he had recognized in the practice of the so-called "European" process, and what he calls the "Sandwich" process, the difficulty, in making a thin plate of glass, of keeping the first very thin sheet at a welding heat for such time as would be necessary to put on the wire and roll the second sheet, and that the main desideratum in rolling these sheets was to get the second sheet rolled over the first sheet as soon as possible, to prevent the first sheet from cooling off too much. He testified that he imparted this idea to Mr. Schmertz, the patentee of the patent in suit, prior to June, 1893. He says:

"I explained to Mr. Schmertz that my idea of making wire glass was to pour a ladle of glass on a table, roll said glass out into a sheet by means of the ordinary glass roller, quickly put a sheet of wire on this sheet of glass, then pour another ladle of glass on the sheet of glass with the wire laying on it, and roll this out a second time, thus forming a sheet of wire glass consisting of two sheets thoroughly welded together with the wire netting between them. I also suggested that, in order to save time and thus prevent the first sheet of glass from cooling off too much, it would be well to lay the sheet of wire right on the first ladle of glass dumped on the table in front of the roller with which it was to be rolled out, and then follow up with a second ladle of glass and the second rolling, as before."

Counsel for the appellees objected to the introduction of this testimony, on the ground that there had been no opportunity, owing to the enforced absence of Schmertz, to cross-examine the witness, Shuman. However this may be, we have the testimony of Schmertz himself, taken in this case, as follows:

"He (Shuman) described to me the European method of making wire glass, which consisted of making a sheet of glass, laying a sheet of wire netting thereon, after the sheet of glass is completed, and then casting a second sheet of glass on the first."

On cross-examination, Mr. Schmertz says: .

"I cannot state the exact date, but I think I got my information as to the 'European' method in the early part of 1890."

At this stage in the development of the art of making wire·glass, in March and April, 1895, we have the applications filed for the patents in suit, letters patent for which, owing to the interference proceedings and the protracted subsequent litigation already outlined, were not issued until May 30, 1905, and No. 791,216 of these, for reasons already explained, was reissued January 30, 1906, with which alone we are at present concerned, as being the only one of the two patents in suit as to which infringement was decreed by the court below. We quote from the specification of this patent the following:

"The purposes of the invention, generally stated, are to devise a certain combination of apparatus and such changes in the process of manufacturing wire glass as will produce a glass with brilliant top surface instead of rough

and dull, also to prevent the glass becoming overchilled in making, so that it will not be excessively hard.

"Wire glass as it is now actually manufactured in this country is made in the following manner: The glass is poured upon the usual casting-bed and a roller pulled over the same, developing a sheet of glass of substantially the thickness of the final product. Back of this roller, which is sometimes termed the 'smoothing-roller,' wire gauze is fed upon the top of the sheet thus formed from a chute or other suitable device. A second corrugated roller now passes over the wire gauze and the sheet of glass and by its ribs deeply indents the wire gauze in the body of the sheet. A third smooth-finishing roller now travels over the sheet thus corrugated and gives a finish to the top of the sheet. Some of the objections to this method are these: The action of the three rollers chills the top surface of the glass excessively before it can be transferred to the annealing-kiln. The result is that the glass becomes unduly hard and is difficult to cut. * * *

"The first or leading roll gives a smooth finish to the top of the glass; but this is immediately ruined by the passage of the corrugated roll in the operation of forcing the wire down into the body of the sheet. This smooth finish is never regained, for although the third roller will efficiently smooth down any elevations on the surface of the glass it will not perfectly transfer the surplus glass to the depressions and fill them up with a perfect weld."

This reference to the prior art is evidently confined to the practice under the Shuman patent, and, as remarked in appellant's brief, would have been materially modified had reference been made to the so-called "European" process, as to which, as we have seen, the patentee was informed. Assuming the Shuman patent to represent the art as practiced in this country, the object of the specification is evidently to differentiate the process and apparatus of the patent in suit from those of Shuman. The specification, therefore, proceeds as follows:

"In the accompanying drawings, which make part of this application, 2 is the ordinary casting-table, having the usual racks 3 3 on its longitudinal edges.

"4 4 are the hand-wheels, which by pinions 5 5 advance the leading roll 6, which may be either smooth or corrugated, and secondary roll 7. These rolls rest upon trangs 8 8 and preferably one-fourth inch in height and which determine the thickness of the glass, subject to a special provision in the leading roll hereinafter described.

"9 9 are the guides, which fix the width of the sheet and are pushed ahead by the rolls.

"10 10 are the rods connecting the right and left hand guides.

"The mechanism thus far described is old and well known.

"11 is a chute for the wire 12, located in advance of the leading roll 6 instead of at the rear of the same, as is common. The leading roll 6 has its ends 13 13 recessed, preferably one-eighth of an inch, so that the body of the roll is left one-eighth of an inch above the bed of the table, while the body of the second roll is one-fourth of an inch above the bed. Obviously these proportional elevations can be obtained in many other ways besides recessing the rolls, and there is no intention to be limited to this precise construction except where specifically claimed. The object had in view is to make the first sheet about one-half the thickness of the resulting product.

"The operation of the device is as follows: A ladleful or suitable amount of glass is poured upon the table in advance of the leading roll and the leading roll moved forward. In practice the leading end of the sheet thus formed is discarded as made of chilled glass, and the introduction of the wire is not commenced until about eighteen inches of sheet has been developed. At this point the wire is fed into the hot glass in advance of the leading roller, passes beneath the same, and emerges at the rear side of the leading roll, pressed slightly into the top surface of a sheet one-eighth inch in thickness or pressed more deeply into the body if the leading roll is corrugated. As the forward end of the sheet moves near the rear roller a second casting is made upon the forward or dead end, so that the imperfect ends of the two sheets may coincide, and thus economize material. The rear roller advancing crushes down this second casting and forces the same over the wire gauze, firmly welding

the material in the second casting to the wire gauze and the first sheet and forming a brilliantly-polished top surface to the product, leaving the wire substantially in the center of the finished sheet, whose thickness will be the height of the rear roller above the bed of the table. The top sheet having only one roller traversing it will not become so chilled as where two or more rollers pass over it and especially where one is a corrugated roll throwing the glass up in ridges.

"This invention is distinguished, therefore, from the art as practiced not only by the superior quality of the product, but as well by the following features, either singly or in combination, viz., by the introduction of the wire in advance of the leading roll, by the use of two rollers in place of three or more, by the formation of an original sheet a fraction of the desired thickness with the wire in its top surface, and by the subsequent welding thereto of a top sheet with unbroken surface and by the use of two castings instead of one."

The figures of the reissued patent are as follows:

Fig. 1.

Fig. 2.

Fig. 5.

Fig. 3.

Fig. 4.

Fig. 6.

Claims 1, 2, 6, and 7 of the reissued patent are as follows:

"1. The process of making glass sheets with wire enclosed therein, consisting in simultaneously forming a layer of glass and introducing wire thereto, and completing the sheet by forming another layer upon the first layer of glass, the process being carried on progressively.

"2. An apparatus for making sheets of glass with wire enclosed therein, consisting of a table, a leading roll to roll a layer of glass, means to support and introduce wire to the said layer, a second roll, behind the leading roll, to form a layer of glass on the first or underneath layer, the periphery of the second roll being higher above the table than that of the leading roll, and the two rolls being far enough apart to allow the glass for the second or upper layer to be poured between them."

"6. An improvement in the process of manufacturing wire glass which consists in rolling a sheet of glass of less thickness than the ultimate product required; simultaneously forcing the wire upon said sheet and forming a second sheet of glass upon said first sheet.

"7. An improvement in the process of manufacturing wire glass which consists in rolling a sheet of glass of about half the ultimate thickness required; simultaneously with the formation of said sheet forcing wire in said sheet and forming a second sheet upon said first sheet."

Mr. Brown, the defendant's expert, thus speaks of these claims:

"I have previously referred to the fact that these three process claims were of slightly different scope. Claim 1 does not set forth any particular relation between the thickness of the first and second layers, while claim 6 specifies that the sheet first rolled shall be of 'less thickness than the ultimate product required,' and claim 7 definitely limits the thickness of the first layer to 'about half the ultimate thickness required.'

"Again, these claims emphasize or direct attention respectively to different features of the process corresponding to the distinctions which the patentee calls attention to as distinguishing from the prior art in so far as he knew it to be practiced in this country. Thus, he stated as one of these features (page 2, line 55) 'the introduction of the wire in advance of the leading roll,' this introduction taking place as soon as the part to be discarded, about eighteen inches, had been developed, which is brought out in this first claim by the step of 'simultaneously forming a layer of glass and introducing wire thereto.'

"The simultaneity of the several steps of the process is brought out when the claim is taken as a whole, the process 'consisting in simultaneously forming a layer of glass and introducing wire thereto, and completing the sheet by forming another layer upon the first layer of glass, the process being carried on progressively.'

"The disclosure of the patent is clear upon this point, for just as soon as the 'dead end' of chilled glass has been developed, the wire is introduced in front of the leading roll, being pressed slightly into the glass as it emerges at the rear of the leading roll, and just as the forward end of the sheet is reached by the second roll, the second casting is at once dumped so that it will be caught by 'the dead end,' the advancing rear roller crushing down this second casting and forcing the same over the wire gauze, firmly welding the material in the second casting to the wire gauze and the first sheet, the entire process being carried on progressively to complete the sheet."

It is abundantly shown by the testimony, that the difficulty recognized in practicing the prior art, as illustrated by the so-called "European" method, was that, in making very thin plates of glass, the first sheet rolled, being extremely thin, was liable to cool and skin over during the interval of time occupied by laying the wire upon it and the rolling of the second or top sheet. Though Shuman's was a one-pour, single-sheet process, he evidently thought that he would avoid this cooling or skinning process, after the wire had been pressed into the molten

metal spread out by the leading roll, by making the smoothing roll follow as closely as possible after the wire laying roll, which also was immediately behind the leading or sheet forming roll. It could hardly escape suggesting itself to one in the least acquainted with the wire glass art, that this difficulty could only be overcome by quickening the steps of the process, so that the interval between the laying of the first and second sheets should not be long enough to materially cool the surface of the sheet first laid. Shuman's device, therefore, with rollers following each other in close succession, was improved upon in the patents in suit, by laying the wire netting simultaneously with the casting of the first sheet, and by the same leading roller, the second sheet being cast over the wire by a roller following as closely as possible the leading roll.

(It may here be noted, that the second of the patents in suit differs from the first or reissue patent, only in the respect that, following the casting of the first sheet by the leading roll, the wire is applied simultaneously with the casting of the second sheet by the following roll. The application for this second patent was at first rejected, by a reference to Shuman's patent, where the wire is laid by the second roll, but was finally allowed by an amendment relating to the feeding of the wire by gravity.)

It seems perfectly clear that the improvement on the so-called "European" method accomplished by this actual simultaneity of the laying of the wire and the rolling of the first sheet, and the close and progressive following of the second roll casting the second sheet on top thereof, was due to the great lessening of the interval of time between the casting of the first and the second sheets, this lessening of time being also aided by the use of two rolls in place of three or more. The simultaneity of this process eliminates entirely any interval of time between its first and second steps, that is, between the casting of the first sheet and the laying of the wire thereon. The fact that it has produced an excellent, and perhaps the best possible result, should not bar the efforts of others to approximate such results by hurrying up the operation of the successive steps of the so-called "European" process.

It is impossible, in view of the prior art, as set out in the record, that we should give so broad an interpretation to the process claims of the patent in suit, as would confer upon the owners thereof a monopoly of the whole art of wire glass making. The patentee of the patent in suit cannot be credited with the discovery that, whatever trouble there was in the practice of the so-called "European" method, was due to the time elapsing between the successive steps of that method, and that a lessening of such intervals would, pro tanto, lessen or remove the difficulty, nor be credited with the invention of a patentable process, by merely suggesting that such intervals be shortened. It surely is unreasonable that such a suggestion should clothe any one with a monopoly of every conceivable process or improvement in machinery, by which these successive steps in the so-called "European" or "sandwich" method could be quickened. If it should, then one practicing that method who, by skill and manual dexterity, brought about its successive steps with greater celerity than had hitherto been accomplished,

even though each step was fully completed before the next one was taken, would be an infringer, and could be compelled to abate his natural or acquired activity, and stand idle for a time long enough to acquit him of the charge of having hurried up the process. It is plain that this was not the invention of the patent in suit. The claims of the patent must be confined to the simultaneity of the particular method, and the particular mechanical means for practicing it, described in the specifications.

The only invention, if any, that can be predicated of the process claimed in the patent in suit, is the simultaneity of rolling the first sheet of glass and laying the wire thereon, accomplished by the means described, of using the same roller at the same time for both operations. To broaden this claim, complainants' counsel was compelled to treat the words "simultaneous" and "simultaneity" as very elastic in their meaning. It is quite true that the word "simultaneous" may be used, according to the subject matter to which it refers, in a sense that does not imply absolute synchronism. The whole operation of either the so-called "European" method or that of the patent in suit, is a matter of a few seconds, and in a certain large sense, according to the thought to be expressed, the word "simultaneous" might be applied to both. But, as said in the opinion of the court below, we must not quibble with words or phrases. The word "simultaneously," as used in the three process claims of the patent in suit, with which alone we are here concerned, leaves no doubt as to what it means in relation to the operation described in said claims. It applies only to the operations of forming the first layer of glass and introducing the wire thereto, operations which, as described, are as absolutely synchronous as, in the nature of things, it is possible for two operations to be.

(The same observation applies to the feeding of wire upon the top of the said sheet simultaneously with the rolling of the second sheet of glass thereon, as in the second patent.)

Simultaneity is not applied or attributed to the operation of the leading and following roll, in forming the first and second sheets, and we are not at liberty to give the word "simultaneous" any other meaning than that given to it in the claims and specifications. Whether the word "progressively," used in the first claim alone, as applied to the movements of the first and second rollers, means anything more than that the process is a continuous one, or what distinction there may be between the steps of the process taken progressively or successively, will, in the view here taken, need little, if any, discussion.

This leads us to an examination of the alleged infringing process and apparatus of the defendant.

The defendant contends that his process is substantially what has been heretofore described as the "European" method. The description of this method, as to which Schmertz testified he had been informed before the date of his alleged invention, we again quote from his testimony:

"The European method of making wire glass * * * consisted of making a sheet of glass, laying a sheet of wire netting thereon after the sheet of glass is completed, and then casting a second sheet of glass on the first."

The learned judge of the court below, in the Pittsburgh Plate Glass Company Case, found the so-called "European" method to have been part of the prior art, as regards the patents in suit. We quote the following from his opinion in the case referred to:

"Indeed, through this protracted litigation, we have seen no reason to change the view we took of Schmertz's process when it first came before us in Schmertz v. Appert [C. C.] 144 Fed. 117, where we said: 'Appert and Schmertz seem to have been working at substantially the same period in developing the wire glass process; the former in France, the latter in America. It related to casting rough plate glass for skylight and other purposes, having a wire mesh embedded in its center. This had been done by what was known as the "European method," which consisted in first casting the lower part of the plate, then placing the wire mesh upon it, then casting the upper part thereon.'"

The Court of Appeals for the District of Columbia, in its opinion in the interference case between Appert and Schmertz, also recognizes the existence in the prior art of this so-called "European" process, which it calls "the foundation of all the processes," as follows:

"The 'European' process, it will be remembered, consisted in making first, a sheet of glass about one-half the required thickness of the completed one, placing the wire thereon, and then rolling another directly upon the top of the first, with the purpose of welding the two together."

Though there was some suggestion in the argument of counsel for appellees, as above described, that this method did not indicate the use of rollers in forming the two sheets of glass, we do not think it can be seriously contended, as we have heretofore said, that the well known and long time use of rollers, in spreading upon a table sheets of plate glass, would not be applied to the wire glass making art thus practiced, and it has already been pointed out in certain patents of the prior art that, by the words "spreading" or "laying" of a sheet of molten glass, it was understood that a roller was used for that purpose. It may be true, as contended by the appellees, that the results obtained in the prior art by this method were not equal to the best results obtained in the improved art, as now practiced either by complainants or defendant, but this so-called "European" method was practiced and, as said by the learned judge of the court below in the case just referred to, was used for casting "rough plate glass for skylight and other purposes, having a wire mesh imbedded in its center."

We have already pointed out that, whatever trouble had been experienced in the practice of this process, was recognized by those skilled in the glass making art, as due to the fact that the necessary intervals of time between the successive steps of the process sometimes allowed the surface of the first sheet to slightly cool or skin before the second sheet was laid, thereby preventing in some cases perfect homogeneity in welding the two. That this was in some degree unavoidable in the earlier state of the art, may be accounted for by the cruder devices then in use for handling molten glass and the absence of modern machinery and appliances.

The defendant had been long engaged in the manufacture of plate glass, using the improved tables, rolls, and appliances which we have already mentioned. It had only to use these improved mechanical de-

vices in the practice of the "European" method, to quicken the speed of the whole operation, and thus lessen the intervals between the several steps. The defendant uses the modern continuous tank furnace in place of the antiquated pot furnace. It uses continuously driven cables to operate the rolls, instead of the slowly operating hand devices. In fact, it used, in the practice of this old method, the devices and appliances it had been successfully using theretofore in the manufacture of ribbed and skylight glass. This quickening in the operation of the process, though only a matter of seconds, was a sufficient improvement in its practice to accomplish the results which we find testified to in the record.

Counsel for appellees lay such great stress upon the contention, that, as a matter of fact, the several steps of the process, as practiced by the defendant, overlap one another, and by so doing, operate progressively, and not successively, that they almost seem to admit that, if the three steps are taken successively, each one after the prior step has been completed, and are nonconcurrent, there would be no infringement. The evidence is conflicting on this point. Mr. Baldwin, of counsel for complainants, testified as to what he saw when visiting defendant's works, by its permission, in order to ascertain the modus operandi there practiced. His testimony does not differ materially from that of defendant's witnesses. The other three witnesses describe what they saw while looking through crevices in the walls of the mill, and testify to overlapping in the steps of the process.

R. M. Paxson, vice president of the defendant company and practical manager thereof, testified as follows, when asked as to this matter of the overlapping of the successive steps in the production of wire glass by his company:

"In answering that question, I would say that occasionally there may have been some slight overlapping, but such a procedure was entirely unnecessary for the production of first-class glass. We have run for weeks at a time without any overlapping, so far as I know, and have produced as good glass and made as large an output of wire glass as we have ever done."

This witness also gives an interesting account of how the defendant came to enter into the wire glass business. He says:

"In looking the situation over, and endeavoring to decide on some method which would accomplish our purpose, it struck us that nothing could be more simple to a glass manufacturer who was at all familiar with the actual workings in a glass factory such as the Highland Company operated, than to adopt the old European process of spreading a sheet of glass, and when it was completed laying on the wire netting and, when that operation was through with, spreading another sheet of glass on top of it. We had been familiar with the spreading of glass for a great many years, and never knew of its being done in any other way than by a roller. Now, as we had rollers and tables and glass, and had already worked our cable method of moving the rolls rapidly up to perfection, it seemed to us there was very little to do in order to carry out this old method. We communicated our desires and ideas to Mr. Neave, our counsel, and he informed us that we could use this old method without interfering with the rights of anybody. Having arrived at this point, we proceeded to get into the wire glass business. In carrying out the ideas of the old European process, we discovered that it was an extremely easy matter to produce a very good product, providing all the conditions which enter into the manufacture were right and worked together. By all the conditions, I mean

to say that first we recognized the fact, as any thoroughly posted glass manu-facturer would, that the nature of the glass itself must of necessity be right. It was not a difficult matter to get a right composition of the metal and to keep the same at the proper temperature, although, as I have previously stat-ed, this temperature will vary more or less in any glass furnace I ever saw. After getting the metal in proper shape, it did not require any very great amount of practical knowledge on the part of a glass manufacturer to know that it must be handled and worked with very quickly, for glass not handled in this way hardens very rapidly, and it would be foolish for any one to at-tempt this manufacture in any other way than by a rapid process.    Now, it goes without saying, that if we got our metal right and our machinery right, there was only one more step, namely, the employés operating the machinery must each and every one be trained so as to work in accord rapidly.    When we got all these things in shape, we had very little difficulty in producing a first-class article of wire glass without any overlapping whatever."

The defendant may well ask whether it may not, without interference by the patents in suit, make wire glass by spreading a sheet of glass, and then, when that operation is completed, laying the wire netting on that sheet, and then, when that operation is completed, spreading an-other sheet of glass on top of the wire and first sheet; and in carrying out this process, whether it may not employ apparatus which was in use many years prior to the practice of the Schmertz process?    We think there can be but one answer to this question, and that is, that any one is at liberty to so do.

The appellees say, however, that one may not do this, if the succes-sive steps of this old method are so quickened as to avoid such a cool-ing of the first sheet as would interfere with the homogeneity of the finished product, because, by so doing, he would approximate or prac-tically, as the court below says, attain, to the simultaneity, which it is claimed is the distinguishing feature of their process.    As we have al-ready said, appellees cannot broadly claim, as covered by their patent, every quickening of the steps of the old "European" method, without regard to the means by which such quickening is produced.    But the argument of the appellees and the opinion of the court below go to the extreme length of supporting such a claim, in order to find infringe-ment.

We quote from the brief of the appellees, as follows (the italics being our own):

"But even supposing the three steps are distinctly nonconcurrent, but fol-low on each other's heels with the utmost rapidity that machine and power of apparatus can secure, we still contend that there is substantial simultaneity, and that the defendants infringe both the substance and spirit of the claims in question of the reissue patent.

"The defendant, by bringing the glass ladles up on an overhead trolley track to points over the table, instead of bringing them up by hand, obviously can get the glass on the table very much more quickly than by hand carriage and dumping.    Furthermore, by having a power chain running at the side of the table, with catches for each roll adapted to be rapidly thrown in engage-ment therewith, the defendant can start the operation of its rolls more quick-ly than is possible by hand power, and can also move them more quickly on the surface of the table, after they have been so started, than was possible by hand power.

"It is therefore apparent that, while the defendant may lag behind at the start, they gallop ahead, so as to arrive at the finish at substantially the same second.  *In other words, they accomplish the result of getting the top sheet rolled before the bottom sheet is cool.*  They themselves admit they are

working in 'seconds' of time 'and things must be done to a nicely to accomplish good results.'"

We find here the somewhat surprising admission of what we have above stated, as deduced from the evidence, viz., that this quickening in the operation of the successive steps of the so-called "European" method was the natural result of the improved appliances which had come to be used in the plate glass rolling art, and which had been so used by the defendant before it had entered upon the manufacture of wire glass. Nothing could more absolutely obstruct the progress of an art, or stifle the natural activities of those engaged in it, than to sanction such a proposition as the one here sought to be maintained. In order to avoid infringement in practicing the old method, one must "lag" at his work, and not hurry up or "gallop" through the different steps of the operation, in order that the top sheet may be laid before any injurious cooling has taken place in the first or bottom sheet; otherwise, the word "simultaneous," as used in the process claims of the patent in suit, may be made to cover what is called practical or substantial simultaneity; although what degree of celerity may be safely practiced in taking these steps is not, and cannot be, stated! We again call attention to the fact that the word "simultaneously," in the process claims, is only used in connection with forming a layer of glass and introducing the wire thereto. This is the simultaneity which has been declared to be the distinguishing feature of the invention of the patent in suit. It is hardly necessary to repeat that no such simultaneous operation is shown or suggested in defendant's alleged infringing process.

That the opinion of the court below was founded upon this extreme contention of the complainants, will be apparent from the following excerpt:

"When the words 'simultaneous,' 'synchronism,' and 'simultaneity' are used in connection with an operation which consists of casting and rolling two large sections of molten glass and introducing a web of fragile wire between, it is physically clear that these three operations cannot be literally and absolutely simultaneous. It is therefore manifest that when we refer to such a series of operations as simultaneous, or when the Patent Office defines them as simultaneous, we and they are not literally accurate, for acts are literally, absolutely simultaneous when they all happen at the same precise instant, but the character of the acts in making wire glass are, as stated in our opinion, of a 'practically' synchronous or simultaneous character. * * *

"Now when this large record is boiled down to the crucial point, it will be seen that the vital point in making a single plate from two pours is, so far as the glass is concerned, simultaneity of operation. Time is of the essence of the operation. And synchronism, practical simultaneity, is the life which the Highland process has imparted to the lifeless, fruitless European process. * * *

"That this operation of making a finished plate is completed in that time shows a rapidity of sequence that we think is aptly described as simultaneous, and that it is practical simultaneity is, we think, conceded virtually by the fact that the practice could be still speeded higher, but that would bring it infringingly near a literal simultaneity. Indeed, that the several steps are virtually and functionally synchronous is shown by the fact that no time intervenes between the steps in which the glass of the lower section can congeal, skin or become stiff, as did in the European process, and prevent the formation of a homogeneous whole. Such instantaneous rapidity of sequence has no prototype in the European process. It is simply not found, taught or

practiced in it, and we are therefore fully justified in saying the Highland practice is not the European process. And the reason why it is not is because it has simultaneity, and because it has simultaneity it gets homogeneity of product."

So we see that the question of infringement in this case was substantially determined upon this broad interpretation given by the court below to the process claims of the patent in suit. The court is compelled arbitrarily to find what it calls a practical simultaneity, called for in the steps of the complainants' method, and for that purpose resorts to uses of the words "simultaneous" and "simultaneity" as sometimes conveniently applied to operations that are only approximately synchronous. The error into which we think the court below has fallen, is in ascribing the simultaneity spoken of in the claims, to the whole operation of making a sheet of wire glass, instead of confining it, as is done in the claims of the patent, to the single step of rolling together the wire and first layer of glass. The word "simultaneous" is only used in the process claims here involved. It occurs nowhere in the specifications, and in these three claims the word "simultaneously" is applied exclusively to the forming of the first sheet of glass and introducing the wire thereto. And this is done, as explained in the specifications, by spreading such sheet of glass and laying the wire thereon by the same movement of the same roller. The word "simultaneous" or "simultaneity" is not used with reference to the operation of casting the second sheet on top of the first, the only suggestion as to this second sheet is in the language of the first claim, "completing the sheet by forming another layer upon the first layer of glass, the process being carried on progressively"; and in the sixth, or second process, claim, "simultaneously forcing wire upon said sheet and forming a second sheet of glass upon said first sheet"; and in the seventh, or third process, claim, "simultaneously with the formation of said sheet forcing wire on said sheet and forming a second sheet upon said first sheet."

That the understanding of the patentee was what the grammatical construction of the claims in this respect implies, is evidenced by the following extract from his affidavit filed in the Patent Office in the course of the interference proceedings:

"Said invention so completed, as aforesaid, consisted, so far as the operation of the same was concerned, in casting a plate of glass in front of the leading roll, simultaneously introducing wire as the leading roll was advanced, making the second casting in front of the second roll, and rolling said second casting into and upon the sheet of glass having the wire adhering to its upper surface."

The specifications of the reissue patent also state that the invention is distinguished from the art as practiced by the following features, viz.:

"*By the introduction of the wire in advance of the leading roll, by the use of two rollers in place of three or more,* by the formation of an original sheet a fraction of the desired thickness with the wire in its top surface, and by the subsequent welding thereto of a top sheet with unbroken surface and by the use of two castings instead of one." (The italics are our own.)

The prior art here referred to is, of course, that set out in the Shuman patent, but what is significant is, that there is no suggestion of simultaneity, except what is implied by the introduction of the wire in advance of the leading roll.

So it is perfectly clear that the distinguishing simultaneity of the invention of the patent in suit related to the formation of the first sheet and the laying of the wire thereon. Following this up with the second casting by the second roll, at some convenient distance not prescribed either in the specifications or claims, except by such signification as may be given to the word "progressively," constitutes the process as claimed in the patent in suit. By this process, the interval between the making of the first and second sheet is undoubtedly lessened and the whole operation quickened by the laying of the first sheet and the wire by the same roller, and at the same time, instead of using separate rollers for each operation, thereby dispensing with three rollers, as used in the so-called "European" method, and constituting a two roller process. But, as we have repeatedly said, the claims of the patent can only cover the particular process and means described, from which, though a quickening of the whole operation undoubtedly results, they cannot be interpreted to cover quickness of operation generally, qua quickness, even if the degree of quickness approximates within a few seconds of simultaneity.

As was said by Judge Sanborn in the Illinois case, involving this same patent, referred to by the appellees:

"It is a patent for an improved process, and in such case it must appear, in order to constitute infringement, that all the steps of the process are substantially used."

It is perfectly clear that this all-important step, as described in the claims of the patent in suit, viz., simultaneously forming a layer of glass and introducing wire thereto, is not practiced by the defendant. It follows, therefore, that the mere quickening of operation shown by defendant's method, even though it involves some "overlapping" in carrying out the steps of the process, does not infringe the process claims of the patent in suit.

This conclusion would also be inevitable, even if we agreed with the court below, that the process claims of the patent imply a "principle of simultaneity" applicable to the entire and completed process; that is, simultaneity as to the forming of the first and second sheets, as well as to the clearly expressed simultaneity in the forming of the first sheet and the laying of the wire thereon. Because no "principle of simultaneity" can be predicated of these operations, if they are successive and disjointed, as in the defendant's process, even if each separate and disjointed operation is performed so rapidly that the resulting process produces homogeneity.

As to the second, or apparatus, claim, the specification itself excludes all appliances and parts as old, except the "chute for the wire, 12, located in advance of the leading roll, 6, instead of at the rear of the same, as is common. The leading roll, 6, has its ends, 13 13, recessed preferably $\frac{1}{8}$ of an inch, so that the body of the roll is left $\frac{1}{8}$ of an inch above the bed of the table, while the body of the second

roll is ¼ of an inch above the bed." It is only necessary to say that the wire chute, if new, is not infringed by the defendant, and that the recessed ends of the first roller is a device that had been practiced before for the same purpose of spacing the roller above the table in the patent to Hainsworth, referred to by the examiner, as appears by the file wrapper.

The defendant has also cited a patent to Conger, in which recessed ends of a roller used for analogous purposes were spaced over the table bed by precisely the same recesses in its ends as are shown in the patent in suit. In fact, the whole aggregation of apparatus and appliances used by the defendant is practically the same as had been theretofore long used by the defendant in the art of plate glass rolling.

The decree of the court below must therefore be reversed.

## Supplemental Opinion.

PER CURIAM. Two patents were involved in this suit. By the decree of the court below the Schmertz patent, No. 791,217, was adjudged to be valid; but there was no adjudication that it had been infringed and, of course, as to it no injunction was awarded. The Schmertz reissue patent, No. 12,443, was adjudged valid and infringed as to claims 1, 2, 6, and 7 thereof, and as to it an injunction was granted and an accounting directed. The Highland Glass Company, the defendant below, appealed and assigned separate causes of error, denying the validity of each of the patents and also denying infringement of the reissue patent.

In the opinion of this court filed February 16, 1910, we considered only the question whether the reissue patent had been infringed. Reaching the conclusion that it had not been, we stated that "the decree of the court below must therefore be reversed." Accordingly, on February 26, 1910, this court entered a decree "that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs." Subsequently, the appellees, the complainants below, moved that the decree of this court be amended so as to read "that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed as to the reissue patent No. 12,443, with costs." Instead of granting that motion when it was made, we directed a reargument of the question whether patent 791,217 had been infringed. The argument has now been made, and it is contended, in the first place, by the learned counsel for the appellees, that, as the appeal is from an interlocutory decree granting an injunction to restrain an infringement of the reissue patent only, we cannot, under the limitations contained in section 7 of the act establishing Circuit Courts of Appeals (Act March 3, 1891, c. 517, 26 Stat. 828 [U. S. Comp. St. 1901, p. 550]), consider the question of infringement of patent 791,217. That section is as follows:

"That where, upon a hearing in equity in a District or in a Circuit Court, or by a judge thereof in vacation, an injunction shall be granted or continued or a receiver appointed, by an interlocutory order or decree in any cause, an appeal may be taken from such interlocutory order or decree granting or continuing such injunction or appointing such receiver to the Circuit Court of Appeals; provided, that the appeal must be taken within thirty days from

entry of such order or decree. and it shall take precedence in the appellate court: and the proceedings in other respects in the court below shall not be stayed, unless otherwise ordered by that court, or by the appellate court or a judge thereof, during the pendency of such appeal; provided further, that the court below may in its discretion require as a condition of the appeal an additional bond."

In Smith v. Vulcan Iron Works, 165 U. S. 518, 17 Sup. Ct. 407, 41 L. Ed. 810, it appears that the Circuit Court, by its interlocutory decree, adjudged the patent there in litigation to be valid and infringed and ordered the cause referred to a master to take an account of profits and damages. The defendant appealed and filed an assignment of errors alleging error in holding that the patent was valid and that it had been infringed. The plaintiff moved to dismiss the appeal so far as it involved any question except whether the injunction should have been awarded. The Circuit Court of Appeals denied the motion and, upon hearing, examined the questions of validity and infringement, and entered a decree reversing the Circuit Court. On certiorari to the Supreme Court it was said:

"The provision of section 7 of the act of 1891 that where, 'upon a hearing in equity' in a Circuit Court 'an injunction shall be granted or continued by an interlocutory order or decree.' in a cause in which an appeal from a final decree might be taken to the Circuit Court of Appeals, 'an appeal may be taken from such interlocutory order or decree granting or continuing such injunction' to that court, authorizes, according to its grammatical construction and natural meaning, an appeal to be taken from the whole of such interlocutory order or decree, and not from that part of it only which grants or continues an injunction. The manifest intent of this provision, read in the light of the previous practice in the courts of the United States, contrasted with the practice in courts of equity of the highest authority elsewhere, appears to this court to have been, not only to permit the defendant to obtain immediate relief from an injunction, the continuance of which throughout the progress of the cause might seriously affect his interests, but also to save both parties from the expense of further litigation, should the appellate court be of opinion that the plaintiff was not entitled to an injunction because his bill had no equity to support it. The power of the appellate court over the cause, of which it has acquired jurisdiction by the appeal from the interlocutory decree, is not affected by the authority of the court appealed from, recognized in the last clause of the section, and often exercised by other courts of chancery, to take further proceedings in the cause, unless in its discretion it orders them to be stayed, pending the appeal. Hovey v. McDonald, 109 U. S. 150, 160, 161, 3 Sup. Ct. 136, 27 L. Ed. 888; In re Haberman Co., 147 U. S. 525, 13 Sup. Ct. 527, 37 L. Ed. 266; Messonier v. Kauman, 3 Johns. Ch. (N. Y.) 66. In each of the cases now before the court, therefore, the Circuit Court of Appeals. upon appeal from the interlocutory decree of the Circuit Court, granting an injunction and ordering an account. had authority to consider and decide the case upon its merits, and thereupon to render or direct a final decree dismissing the bill."

And in Mast, Foos & Co. v. Stover Manufacturing Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856, it was held, in a patent case, that the Circuit Court of Appeals has the power to order the dismissal of a bill even before answer filed. or proofs taken, upon an appeal from an order granting a preliminary injunction. The court said:

"If no question be made regarding the identity of the alleged infringing device, and it appear clear that such device is not an infringement, and no suggestion be made of further proofs upon the subject, we think the court should not only overrule the order for the injunction, but dismiss the bill."

The rule of practice declared in these two cases is not inapplicable to the case now in hand merely because we have here two patents in suit. The bill of complaint contains an averment that the improvements described in the two patents are conjointly used by the defendant in its alleged infringing structure. We can perceive no reason why, if we may order the bill to be dismissed as to the reissue patent on the ground of noninfringement, we may not also do so as to the other patent. As was said in Smith v. Vulcan Iron Works, section 7 of the act establishing Circuit Courts of Appeals "authorizes, according to its grammatical construction and natural meaning, an appeal to be taken from the whole of such interlocutory order or decree, and not from that part of it only which grants or continues an injunction."

Nor is the opinion in the case of the National Enameling Co., 201 U. S. 156, 26 Sup. Ct. 404, 50 L. Ed. 707, inconsistent with such a rule. There the Circuit Court adjudged certain claims of the patent in suit to be valid and infringed, certain others to be valid but not infringed, and certain others to be invalid. As to the claims adjudged to be valid and infringed, an interlocutory decree was entered awarding an injunction and referring the cause to a master to take an account of profits and damages; as to the remaining claims, the bill was dismissed. The defendant appealed from so much of the decree as awarded an injunction and an accounting; the complainants appealed from the part of the decree dismissing the bill. The Supreme Court held that there was no authority under section 7 of the above-mentioned act for the appeal of the complainant. In referring to Smith v. Vulcan Iron Works, the court said that "nowhere in the opinion is it intimated that the plaintiff was entitled to take any cross-appeal or to obtain a final decree in the appellate court"; but it is conceded that where the defendant appeals from an interlocutory order granting an injunction, and the Circuit Court of Appeals "is of the opinion that the patent is absolutely void, it would be a waste of time and an unnecessary continuance of litigation to simply enter an order setting aside the injunction and remanding the case for further proceedings." So here, if we are satisfied on the proofs before us that patent 791,217 has not been infringed, it would be a waste of time and an unnecessary continuance of litigation simply to reverse the decree of the Circuit Court as to the reissue patent and leave the case in that court for further proceedings as to patent 791,217.

And we are so satisfied. Much that was said in the original opinion concerning the alleged infringement of the reissue patent is equally applicable to the alleged infringement of the patent now under consideration. It has four claims. The third and fourth are process claims. In each of them one of the steps in the process is "simultaneously feeding by gravity wire upon the top of said sheet [that is, the bottom sheet] at the rear of the leading roll and rolling a second sheet of glass upon said original sheet and the wire, simultaneously embedding the wire and finishing the sheet." In our former opinion we showed that the simultaneity of operations in the reissue patent is in forming the first layer of glass and introducing the wire thereto. In patent 791,217 the simultaneity of operations is in feeding the wire by gravity and rolling the second sheet upon the first sheet. In the latter

case no more than in the former is there infringement by the defendant, for it does not have simultaneity of operations in the sense in which that step in the process is described in either of the patents in suit.

The first and second claims are as follows:

"1. In the manufacture of wire glass, the combination of a table, a leading roll, a second finishing roll, and means for introducing the wire by gravity between said leading and finishing rolls.

"2. In the manufacture of wire glass, the combination of a table, a leading roll with recessed ends, a finishing roll whose body is higher from the bed of the table than the body of the leading roll, and means for introducing the wire by gravity between said leading and finishing rolls."

Without discussing in detail the evidence in relation to these two claims, we deem it sufficient to say that the defendant does not have a second finishing roll, nor does it introduce the wire by gravity between leading and finishing rolls. It has three rolls, one for rolling the first or bottom layer of glass, the second for rolling the wire on top of the first layer of glass, and the third for rolling the second layer of glass over the wire and the first layer of glass.

Our conclusion is that the decree of this court entered February 26, 1910, should be amended so as to provide that the decree of the Circuit Court be reversed, and the bill of complaint dismissed, with costs, and that the record be remanded to the Circuit Court to carry out this order.