COMMERCIAL ACETYLENE CO. et al. v. SEARCHLIGHT GAS CO. et al.

(District Court, N. D. Illinois, E. D. June 26, 1912.)

No. 30,301.

1. PATENTS (§ 132*)—TERM—LIMITATION BY PRIOR FOREIGN PATENT.

In order that a foreign patent should be for the same invention as a later United States patent so that the latter expires with the former under Rev. St. § 4887 (U. S. Comp. St. 1901, p. 3382), before its amendment in 1897, the invention must not only be disclosed but claimed in the foreign patent, but substantial identity is all that is necessary, and the description need not be literally the same.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 188½–191; Dec. Dig. § 132.*]

2. PATENTS (§ 132*)—TERM—EFFECT OF INTERNATIONAL CONVENTION.

Article 4 bis., inserted in the International Convention for the Protection of Industrial Property of March 20, 1883, by the additional act of convention signed at Brussels December 14, 1900, taking effect September 14, 1902, 32 Stat. 1940, as controlled and construed by Act March 3, 1903, c. 1019, 32 Stat. 1225 (U. S. Comp. St. Supp. 1911, p. 1453), "to effectuate the provisions" of such additional act of convention, did not have the effect of changing the term of an existing United States patent as fixed by statute at the time of its issuance; and such a patent granted prior to January 1, 1898, and which is limited by the provisions of Rev. St. § 4887 (U. S. Comp. St. 1901, p. 3382), to the term of a prior foreign patent, is not extended by such additional act.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 188½–191; •Dec. Dig. § 132.*]

3. PATENTS (§ 328*)—TERM—FOREIGN PATENT—ACETYLENE GAS TANKS.

The Claude & Hess patent, No. 664,383, for an apparatus for storing and distributing acetylene gas, is limited as to term by the British patent, No. 29,750, of 1896, granted to the same patentees, which expired by limitation June 30, 1910. Also, *held* not infringed.

In Equity. Suit by the Commercial Acetylene Company and the Prest-O-Lite Company, against the Searchlight Gas Company, George F. Schroeder, and Oscar Baur. On final hearing. Decree for defendants.

For former opinion, see 188 Fed. 85.

Clarence Winter, Keyes Winter, John P. Bartlett, Brothers & Mills, and Charles H. Hamill, for complainants.

Robert H. Parkinson, John S. Miller, Merritt Starr, and Wallace R. Lane, for defendants.

KOHLSAAT, Circuit Judge. Final hearing. This cause was before the court on April 25, 1911, on motion for a preliminary injunction. The matter involved is the gas package described in claims 1, 2, and, 5 of letters patent No. 664,383, granted December 25, 1900, to Bruno Abdank-Abakanowicz, assignee of Claude & Hess, the inventors, for an apparatus for storing and distributing acetylene gas. On that hearing, the court was of the opinion that the invention covered by the patent in suit was fully disclosed in the British patent No. 29,750, issued to Claude & Hess upon application filed June 30,

1896, which patent expired on June 30, 1910, under the British law; that at the time this suit was instituted (February 1, 1911), and at a time more than seven months prior thereto, the patent in suit had expired with the said British patent; and that at the time of filing the bill herein for an injunction, no cause of action existed, in view of the provisions of section 4887 of the Act of July 8, 1870, as amended by the Act of March 3, 1897 (U. S. Comp. St. 1901, p. 3382). At this hearing, complainant contends that the court was in error in so holding; that the British patent did not cover an apparatus device; and that by reason of the Treaty of Brussels (Dec. 14, 1900, 32 Stat. 1936), which became operative between the United States and certain foreign countries, including England, on September 14, 1902, and of the Act of March 3, 1903, c. 1019, 32 Stat. 1225 (U. S. Comp. St. Supp. 1911, p. 1453), the said provision of the Act of March 3, 1897, leaving the terms of the act of 1870 in force as to all applications filed and patents granted prior to January 1, 1898, was repealed, whereby the life of the patent in suit was extended to the full term of 17 years, and was therefore a valid right at the time this bill was filed.

For the defense, it is insisted: (1) That the apparatus involved herein was not new; (2) that the patent had expired before suit was brought; (3) that defendant does not use the reducing-valve, and, consequently, does not infringe.

On March 1, 1897, Claude & Hess filed in the Patent Office their two applications for patents, the one numbered 625,580, ostensibly for an apparatus, being that upon which the patent in suit was granted, and the other numbered 625,581, ostensibly for a method of storing acetylene, consisting in forcing acetylene under pressure into a liquid solvent, such as acetone. This latter application proceeded as far as the Commissioner, following whose adverse rulings the applicants seem to have abandoned it entirely. Before so doing, they had changed their specification and so amended their proceedings that there remained little difference between it and its companion application.

"The object of the present invention," they state (D. R. 296) "is to provide means for distributing the gas in holders without reducing the same to a liquid by direct compression, although providing for the storage of a large quantity of the gas in a small space without encountering dangerous pressure," etc.

With regard to said last-named application, counsel for applicants, in their argument before the Commissioner, state:

"It is proper to say, however, that in our judgment the illustration contained in the apparatus case, or a portion thereof, should be reproduced in this, since the reducing-valve, or some equivalent thereof, is contemplated in the claims in this."

This is urged in support of defendants' contention that the apparatus claim is for nothing more than an ordinary receptacle, inseparable from the method claim, unless read in connection with an automatic reducing-valve, which they do not employ. The Commissioner disposed of the matter in the following language:

"If there were any novelty in using a pressure regulator to permit gas under pressure to flow at a uniform rate to its place of use, these claims

might have some standing. But such devices are common in the arts, so common that one whole class of patents is devoted to them. * * * These pressure-regulating devices are used wherever gases under higher pressure than is desired are to be distributed, or used under lower uniform pressure. The use of this old apparatus to perform its usual function in connection with an old method of compressing gas into a solution is not a new invention, but a mere application of the expected knowledge of any one familiar with the art of gas distribution."

In their application, serial No. 625,580, on which the patent in suit was granted, complainants disavow any intention of attempting to secure a patent upon the vessel used to contain a liquid, but claim "a closed receptacle containing acetylene gas in solution." Page 1, col. 1, 1. 28.

The claims in suit, Nos. 1, 2, and 5, read as follows, viz.:

"1. A closed vessel containing a supersaturated solution of acetylene produced by forcing acetylene into a solvent under pressure, said vessel having an outlet for the acetylene gas which escapes from the solvent when the pressure is released or reduced, and means for controlling said outlet whereby the gas may escape therethrough at substantially uniform pressure, substantially as described.

"2. A prepared package consisting of a tight shell or vessel; a solvent of acetylene contained within said vessel; and acetylene dissolved in and held by said solvent under pressure and constituting therewith a supersaturated solution, the package being provided at a point above the solvent with a reducing-valve, substantially as and for the purpose set forth."

"5. As a new article of manufacture, a gas package comprising a holder or tight vessel; a contained charge of acetone; a volume or body of gas dissolved by and compressed and contained within the solvent; and a reducing-valve applied to an opening extending to the interior of the holder above the level of the solvent, substantially as set forth."

In substance, as will be seen, claim 1 calls for a receptacle containing a supersaturated solution of acetylene; claim 2 calls for a receptacle containing a solvent for acetylene, acetylene forced thereinto and held under pressure; and claim 5 calls for a receptacle, a body of acetone, a body of gas dissolved and compressed within the solvent. Claim 1 also calls for an outlet for the gas, controlled so as to produce uniform escape pressure. Claims 2 and 5 call for reducing-valves above the storage chamber. The specification (page 1, col. 1, 1. 47) reads:

"The inlet and outlet passages are provided with suitable valves or cocks to close the same after the receptacle is charged with gas and when it is not in use. It is further desirable for the proper operation of the burners supplied in this way that the gas should be delivered thereto under a substantially uniform pressure only slightly above the atmospheric pressure, and for this purpose means are provided for controlling the outlet whereby the gas is allowed to escape therethrough at substantially uniform pressure, a reducing-valve being herein shown as interposed between the interior of the receptacle which contains the dissolved gas and the outlet from which said gas is allowed to escape for use."

And again (page 1, col. 2, 1. 92) it is said:

"In order that the gas delivered from the receptacle may pass into the pipes to the burners under a substantially uniform pressure (the pressure of the gas within the receiver, of course, decreasing as the gas passes out therefrom), a reducing-valve $d$ of any suitable or usual construction is interposed between the interior of the receptacle and the outlet $c$ therefrom. As herein shown, the said reducing-valve is in a passage $d2$, connecting the spaces be-

low and above a wall or partition $d3$ near the upper portion of the receptacle $a$. The dissolved acetylene being contained in that portion of the receptacle which is below the said partition, the portion above being normally empty and forming a reservoir for the gas at low pressure which has passed into said reservoir through the said reducing-valve. In order that the reducing-valve $d$ may be set or adjusted to respond to any desired pressure, the vessel $a$ is shown as provided with a removable plug $d4$, through which access may be had to the adjusting-stem $d5$ of said valve. It is obvious that through the agency of the reducing-valve the pressure in said upper reservoir will be substantially uniform, so that the supply of gas in the pipes is properly controlled, the pressure being substantially the same when the receptacle is fully charged as when it is nearly exhausted."

It is also apparent from the drawings of the patent in suit herewith produced that the automatic reducing-valve is an essential element of

complainant's combination, and a necessary feature in securing the uniform pressure called for in claim 1 in discharging the gas.

Defendants employ no reducing-valve such as contemplated in the patent in suit. They do not provide for uniform pressure of the escaping gas. They deliver the gas to the burner or receptacle directly from the storage tank, regulating the volume of the flow by a cock or valve, preferably a needle-valve. No attempt is made to secure a uniform pressure. Complainants, it is said, now use no reducing-valve, but employ the needle-valve. This form of valve is very old. It was held by Judge Quarles, in Commercial Acetylene Co. v. Avery Portable Lighting Co. (C. C.) 166 Fed. 907, that the needle-valve was the equivalent of the reducing-valve, and that construction seems to have been placed upon the two valves by several of the courts in the Sixth circuit. The specification and drawings of the patent in suit show a valve $c3$ in the outlet pipe $c$, above the reducing-valve. This corresponds to defendants' outlet valve. In the patent, it is assigned no other function than to close the receptacle and "be opened after

the receptacle is properly coupled for use." Thus, the only service of the valve *c* in the device in suit, is to confine the gas to the receptacle when not in use. Presumably, the gas in the tank above the reducing-valve is at uniform and usable pressure. The volume is not diminished, only the pressure. Judge Quarles in his opinion says:

"What is the pith of this invention? It is to furnish means to store compactly and transport safely acetylene gas for illuminating purposes."

Such, however, was not the avowed object of the inventor of the device of the patent in suit, who declares that:

"The invention pertains to apparatus for the storage and distribution of acetylene gas."

Manifestly, the reducing-valve and uniform pressure had nothing to do with either the storing or transportation of the gas. It is inferable from the opinion that the foreign patents and the abandoned application were not before the judge, since he seems to have been mainly impressed by the fact that acetylene had the property of being greatly condensed in a solvent under pressure, as acetone, although this was a process well known with regard to other gases—for instance, carbonic acid gas for use in the production of soda water.

The court was led into the above statement, no doubt, by the testimony of the expert, who stated that the invention involved in the Milwaukee case (being the present alleged invention) related "to an improved method of storing acetylene for lighting and other purposes in a small volume in order that it may be supplied in portable form to the consumer, and it consists in dissolving the acetylene under pressure in certain liquids; the effect of the pressure being to so increase the solubility of the acetylene as to enable a considerable quantity of acetylene to be stored in a small volume or in readiness to be supplied for any purpose for which it may be required."

Judge Quarles seems to have lost sight of the distinction now claimed between the alleged invention there and here in suit and that of the foreign method and apparatus patents. The uniform pressure idea was only an incident of the court's mind. The great utility and novelty of the storage or absorption of acetylene gas in acetone, whereby the gas was reduced to $1/300$ part of its normal volume, overshadowed the mere seeming technical point of a difference in valves, which is the matter here relied on for differentiating the apparatus of the patent in suit from that of the British patent.

At the time of the hearing at Milwaukee, the foreign patents had not run their respective lives, and no question of the expiration of the patent in suit contemporaneously with the expiration of the foreign patents was presented. Now, that is the vital matter before the court.

It is defendants' contention that if, as found in the Avery Case, the use of an ordinary needle-valve is an infringement or equivalent of complainants' reducing-valve, then the apparatus in suit is disclosed in the foreign expired patents, and that if a needle-valve is the equivalent of a reducing-valve, a stopcock would be the equivalent of a needle-valve, and therefore of a reducing-valve. True, a needle-valve would resist the pressure of the contained gas somewhat more ac-

curately than an ordinary valve or cock; but the difference would be one of degree. Given the right to use a supersaturated solution of acetylene produced by forcing acetylene into acetone under pressure, infringement can hardly be predicated upon the use of an ordinary receptacle with an ordinary outlet valve, in distributing the same.

[1] Assuming that the said British patent had expired at the time this suit was commenced, and that the patent in suit expired with it, as to any claims common to them both, was the substance of the patent in suit covered and claimed in the British patent? For it is not enough that the subject-matter be disclosed in the latter; it must be claimed. Bate Refrigerating Co. v. Sulzberger, 157 U. S. 1, 15 Sup. Ct. 508, 39 L. Ed. 601; Société Anonyme, etc., v. General Electric Co. (C. C.) 97 Fed. 604; Edison Electric Light Co. v. Waring Electric Co. (C. C.) 59 Fed. 358; American Bell Tel. Co. v. Cushman (C. C.) 57 Fed. 842.

It is, however, not essential that the identity of the subject-matter be established literally. In Siemen v. Sellers, 123 U. S. 276, 8 Sup. Ct. 117, 31 L. Ed. 153, the court says:

"As to the first question" (i. e. whether the English patent was for the same invention as the American patent), "we have carefully compared the two patents * * * and see no essential difference between them. They describe the same furnace in all essential particulars. The English specification is more detailed, and the drawings are more minute and full; but the same thing is described in both. There is only one claim in the English patent, it is true. But that claim, under the English patent system, entitled the patentees to their entire invention, and is at least as broad and comprehensive as all four claims of the American patent. * * *

"It is contended by the counsel of the complainants that the American patent contains improvements which are not exhibited in the English patent. But if this were so, it would not help the complainants. The principal invention is in both, and if the American patent contains additional improvements, this fact cannot save the patent from the operation of the law which is invoked, if it is subject to that law at all."

In Steinmetz v. Allen, 192 U. S. 543, 24 Sup. Ct. 416, 48 L. Ed. 555, it is held that a patent may embrace more than one invention, and it may embrace a process and the apparatus by which it is performed. This decision is followed in Leeds & Catlin v. Victor Talking Machine Co., 213 U. S. 301, 29 Sup. Ct. 495, 53 L. Ed. 805. The last-named case is relied upon by complainants as supporting their contention that the patent in suit did not expire with the British patent. In that case it was held that the inventions there in suit were not exhibited in the British patent, and that the patent in suit did not expire with the British patent. To the same effect are Accumulator Co. v. Julien Electric Company (C. C.) 57 Fed. 605; Mott Iron Works v. McShane Mfg. Co. (C. C.) 80 Fed. 516; Holmes v. Metropolitan, etc., Co. (C. C.) 33 Fed. 260; Brush Electric Company v. Electrical, etc., Co. (C. C.) 47 Fed. 52.

The fact that some slight modification is made in the working of the principle involved in the invention will not exempt the patent from the operation of the statute. Clark v. Wilson (C. C.) 28 Fed. 95.

In Commercial Mfg. Co. v. Fairbank Co., 135 U. S. 176–194, 10

Sup. Ct. 718, 724 (34 L. Ed. 88), the court concurs in the statement of the Circuit Court, viz., that:

"A fair test of the question as to whether the American patent is anticipated by the foreign patents, or is included in them, we think, would be: Were a person in this country after the issue of the present American patent to commence the manufacture of oleomargarine by the precise process described in the Bavarian or American patents, supposing that process had not been patented abroad, would the courts refuse an injunction to restrain the use of the process on the ground that it infringed that covered by the American patent? We can hardly deem it possible that any intelligent court would deny an injunction if applied for under such circumstances, and we think this fairly illustrates the relation of the foreign to the American patent."

If, therefore, the British patent here under consideration does not cover the subject-matter of the patent in suit, the defense set up herein must fall. If, on the other hand, the British patent is in substance for the same subject-matter as the patent in suit, and was not given an extension of life by the treaty of 1900 and by the amendment of 1903, as claimed by complainants, then it would follow from section 4887 of the act of 1874, and from the following citations, that the patent in suit died with it, and a bill for injunction would not lie at the time when the bill was filed. Commercial Mfg. Co. v. Fairbank Co., 135 U. S. 176, 10 Sup. Ct. 718, 34 L. Ed. 88; Siemen v. Sellers, 123 U. S. 276, 8 Sup. Ct. 117, 31 L. Ed. 153; Leeds & Catlin v. Victor Talking Machine Co., 213 U. S. 301, 29 Sup. Ct. 495, 53 L. Ed. 805; Western Electric Co. v. Citizens' Telephone Co. (C. C.) 106 Fed. 215.

The specification accompanying the British patent, No. 29,750 (page 354 D. R.), relied upon by defendants as covering the invention in suit, reads as follows, viz.:

"When gas is withdrawn from a receiver containing a solution of acetylene under pressure, the pressure necessarily falls constantly, and to obtain a regular supply of gas we provide the vessel with a pressure regulator. The process may be carried out as follows, for instance, although subject to modifications:

"The acetylene is dissolved in the liquid chosen, by the means ordinarily employed in making soda water; the solution of the gas being facilitated by agitation under pressure in contact with the liquid. The solution under pressure, however obtained, is filled into a receiver of metal or of glass (such as used for soda water) capable of resisting the pressure employed. The receiver has a cock and the necessary adjuncts for connection, directly or through an expansion chamber, with the appliances in which the gas is used by the consumer; the substitution of charged for empty receivers being readily effected."

The receiver is covered by claim 6 of the British patent, which reads as follows, viz.:

"The employment of a receiver containing a liquid charged with acetylene under pressure and from which the acetylene is evolved when required for use as specified."

"The words 'substantially as specified' mean substantially as specified in regard to the combination which is the subject of the claim." Lake Shore, etc., R. R. Co. v. Car Brake Shoe Co., 110 U. S. 235, 4 Sup. Ct. 36, 28 L. Ed. 129.

It is claimed that all four of the foreign patents are for substantially the same invention; each having claims for the storing of acetylene, as well as for the receptacle required therefor, and for distributing or delivering the gas to the destination, whether tank or customer. Each of these patents provides, by claim and specification, for a cock or valve to control the distribution of the gas as hereinafter set out. It will be noticed that claim 6 of the British patent calls for "a receiver containing a liquid charged with acetylene under pressure," etc., as an element of the combination. This is also true of claim 1 in suit. Claim 2 in suit calls for a package, a solvent of acetylene in the package, a supersaturated solution of acetylene, etc. Claim 5 calls for a package, contained acetone, gas contained in the solvent, etc. These elements, whether separately enumerated or combined into a charged package, are substantially identical. The reducing-valve and the discharge-valve are plainly found in all the foreign patents and that in suit, as well as in the abandoned so-called method patent.

Applications were made in this country, as above set out, for two separate patents, being a division of the invention of each of the foreign patents, the one in suit, No. 625,580, for an apparatus, and its companion, No. 625,581, for a method of storing, etc., "for which," says the latter specification, "we have received letters patent in France dated June 30, 1896, No. 257,679." They might just as well have named the British patent.

"The object of the present invention," they state, with reference to the so-called abandoned application (D. R. 296), "is to provide means for distributing the gas in holders without reducing the same to a liquid by direct compression, although providing for the storage of a large quantity of the gas in a small space without encountering dangerous pressure," etc.

Claim 1 of the abandoned application, as amended, calls for a method of storing and delivering gas (D. R. 311). So that the inventors, in their French patent, admittedly, intended to cover the method of distributing gas as well as of storing it. How could this be done without disclosing an apparatus or receptacle? The specification to the French patent is very suggestive. It reads in part as follows, viz.:

"The present invention relates to *an apparatus* for storing acetylene by means of which acetylene may be stored in a small space, transported conveniently, and used for any purpose whatsoever in particular for lighting purposes."

And later:

"When from a receiver containing an acetylene solution under pressure, gas is withdrawn, the pressure is necessarily constantly lowered. If we desire to obtain a regular discharge of the gas, as is necessary, for instance, for lighting purposes, we provide this receptacle with a *reducing apparatus* of suitable construction."

And again:

"The receptacle is provided with a cock and the necessary accessories for being placed in communication with the apparatus for using the gas at the consumer's house. Either directly or with the intervention of a *reducing apparatus*."

Claim 2 reads:

"For the purpose of dissolving large quantities of acetylene under pressure in a small volume of liquid, the employment of the methods and *apparatus* used for obtaining a solution under pressure of the gases in other liquids. particularly of carbonic acid gas in water."

The patent was issued October 19, 1896, and numbered 257,679. It expired June 30, 1911. They were unable to satisfy the Commissioner that they were entitled to patents for two inventions and were obliged to elect—probably because they failed to distinguish between the two features of the British patent. There seems to have been considerable confusion growing out of the attempt to prolong the life of the patent beyond that of the English patent by means of a separate apparatus patent, as a new invention, when, as a matter of fact, the apparatus is clearly covered by the British patent in claim 6 thereof, and, it is claimed, expired when the so-called method patent expired. This apparatus is in no sense different from that long used in connection with water and carbonic acid gas as applied, for instance, to soda water, or from that used in the storing and delivery of ammonia and other gases.

The only new feature in the patent in suit and the apparatus claims of the foreign patents, if there be any, consists in the substitution of acetylene gas absorbed in acetone, contained in a receptacle, as an element, instead of the above-named gases and others, and, perhaps, the peculiar form of reducing-valve used by complainants, though they place no importance upon their automatic valve, having adopted a plain needle-valve as a substitute for their valve and cock.

An examination of the German and Swedish patents throws some light on the scope of the English patent. These were all taken out about the same time, and serve to show the scope of the inventions for which the foreign patents were taken out; for, while the language of the several claims and specifications vary somewhat, they are all, in substance, for the same thing.

The German patent, No. 97,953, was published June 28, 1898, and expired August 26, 1911, and covered an invention for the "employment of fluids charged with acetylene for the purposes of enabling the acetylene to be used." The specification reads in part (D. R. 378), after setting out the several desirable absorbents, among others acetone, as follows, viz.:

"The recipients designed to contain the fluid saturated with acetylene are fitted with a cock or valve through which the gas escapes in proportion as the pressure decreases, and it is then susceptible of being employed for the usual purposes. * * * As the pressure of the gas decreases while escaping from the absorbing fluid, a pressure-reducing or pressure-regulating device of any given construction is introduced in cases where a constant pressure is required."

Again, on page 383:

"In cases where it is necessary to draw the gas from the bottle at constant pressure, a pressure regulator is inserted, as stated above; the acetylene may either be conveyed into a gasometer, or one of the many known pressure-reducing devices may be fitted immediately above the gas outlet. As stated, the devices described above and shown in Figs. 1 and 2 are

given merely as illustrations for the purpose of explaining the process, and the latter is entirely independent of the embodiments indicated."

The one claim reads as follows, viz.:

"The employment of fluids charged with acetylene under pressure for the purpose of enabling the acetylene to be used for lighting, heating, power plants, and the like, characterized by the fact that the acetylene under pressure is absorbed by a suitable fluid, and the fluid saturated with acetylene stored or contained in suitable recipients, from which the acetylene gas may be supplied for consumption; pressure regulator being expediently inserted."

Figs. 1 and 2 referred to in the specification above quoted are as follows:

*Fig. 1.* *Fig. 2.*

The Swedish patent, No. 10,376, dated December 23, 1896, issued November 16, 1899, and expiring December 23, 1911, is for a "method for producing acetylene in such form that large quantities of same can be obtained in small volume, also for this purpose, *means* for *solution* and *container*." (D. R. 391.)

The specification (D. R. 393) says:

"When gas is withdrawn from a receiver containing a solution of acetylene under pressure, the pressure necessarily falls constantly. To obtain a regular supply of gas which is necessary for illumination, etc., the receiver is provided with a pressure-reducing apparatus of suitable construction. Below is described a practical way of carrying out this principle:

"The acetylene is dissolved in the liquid chosen, in the usual way, as, for instance, in making soda water, when the solution of the gas is facilitated by agitation under pressure in contact with the liquid. The solution under pressure, however obtained, is filled into a receiver of metal (or of glass as soda water syphons) that can withstand the pressure used. The receiver has a cock and the necessary adjuncts for connection, either direct or through a pressure-reducing apparatus, with the appliances in which the gas is used by the consumer. With these arrangements the empty receivers can easily be replaced by filled ones, and the consumer need not produce the product he uses."

On the same page (line 28) it is said:

"Attached drawing shows, however, only as example. * * * Fig. 2 is a section of a receiver, and Figs. 3 and 4 show in vertical and horizontal sections a pressure-reducing apparatus."

Again, at line 11, p. 395, D. R., it is said:

"In Fig. 2 is shown, as an example, a receiver with an absorbing liquid comprising an acetylene accumulator. This receiver, of any desired form, with walls that can sustain a strong pressure, is provided with an opening T, a valve R for letting out the gas," etc.

And again (D. R. 396, 1, 4):

"When it is desirable that the flow of gas should be of constant pressure, it is necessary to use a pressure regulator, as before mentioned. This can simply consist of a gasometer, into which the receivers empty, but one can more directly in the passage of the gas, attach one of the many existing pressure regulators at opening T."

Claim 3 calls for:

"A container of suitable material containing a solution of acetylene in certain liquids under pressure as enumerated in claims 1 and 2, one of which is acetone and provided with a cock and faucet and other necessary arrangements for connection with the consumption apparatus, either direct or through a pressure regulator."

As will be seen, the French, German, and Swedish patents expired, respectively, on June 30, 1911, August 26, 1911, and December 23, 1911; whereas, the bill was filed in January, 1911, and the amended bill in February, 1911. So that, when the bill herein was filed, the above-named three patents had not expired. They are herein fully set forth in order to make plain the full conception the inventors had of the method and apparatus required in making the invention available. They emphasize the language of the British patent which expired by limitation on June 30, 1910. It is defendant's contention that the latter expired on June 30, 1900, for failure to pay renewal fees as provided by the English law. This point it is not deemed necessary to pass upon. The proposition seems doubtful under the language of Pohl v. Anchor Brewing Company, 134 U. S. 381, 10 Sup. Ct. 577, 33 L. Ed. 953, and Leeds & Catlin Company v. Victor Talking Machine Co., 213 U. S. 301, 29 Sup. Ct. 495, 53 L. Ed. 805.

The foreign patents, including the British patent, even provide for the delivery of the package, already charged, as an article of merchandise, and the substitution for an exhausted package of a renewed package, to consumers, as does that in suit. It is difficult to conceive of the employment of any package or container used in storing and distributing acetylene gas under pressure, however crude and common, which would not infringe the device in suit were the complainant's contention to be sustained.

[2] Complainant insists, as above stated, that by the treaty of 1902 and the act of Congress passed March 3, 1903, the limitation placed upon the life of foreign patents, where a domestic patent for the same invention was applied for, prior to January 1, 1898, was removed.

Section 8 of the Act of March 3, 1897, c. 391, 29 Stat. 692 (U. S. Comp. St. 1901, p. 3385), provides that that act shall take effect January 1, 1898, and shall not apply to any patent granted or application filed prior to that date, so far as the act deals with the taking out of a patent in cases where a patent has first been taken out in a foreign country.

It will be noted that by the act of 1897 the life of a domestic patent was not limited to the life of the prior foreign patent. The only requirement was that the domestic application should be filed within seven months from the filing of the application for the foreign patent.

By the Treaty of Brussels, entered into March 17, 1901, and going into effect September 14, 1902, it was provided (article 4 bis.) that:

"Patents applied for in the different contracting states, by persons admitted to the benefit of the convention under the terms of articles 2 & 3, shall be independent of the patents obtained for the same invention, in other states, adherents or nonadherents to the Union. This provision shall apply to patents existing at the time of its going into effect. The same rule applies in the case of adhesion of new states to patents already existing on both sides at the time of the adhesion."

It is conceded that the states whose patents are under consideration herein were parties to that treaty. At the date of this convention the British patent had not expired. The effect of this treaty was under consideration by the Circuit Court of Appeals for the First Circuit in the case of United Shoe Co. v. Duplessis Shoe Co., 155 Fed. 842, 84 C. C. A. 76, where it was held that the treaty did not have the effect of removing the limitation thereto existing upon a patent applied for before January 1, 1898, under the provisions of the Act of July 8, 1870, c. 230, 16 Stat. 201, whereby the lifetime of a later domestic patent was limited to that of the foreign patent. That case is well considered and very persuasive. It is deemed to be the correct expression of the law for the purposes of this hearing. It has been followed in Malignani v. Hill-Wright Electric Company (C. C.) 177 Fed. 430; Malignani v. Jasper Marsh Consolidated Electric Lamp Company (C. C.) 180 Fed. 442. The same doctrine is approved in Highland Glass Company v. Schmertz Wire Glass Company, 178 Fed. 944, 102 C. C. A. 316. Commenting upon the act of 1903 entitled "An act to effectuate the provisions of the additional act of the international convention (of December 14, 1900) for the protection of industrial property," the court in Shoe Machine Company v. Duplessis Shoe Mach. Co., supra, having reference to the language of Dallemagne v. Moisan, 197 U. S. 169, 25 Sup. Ct. 422, 49 L. Ed. 709, said:

"Fairly paraphrasing the language of the Supreme Court cited, we may say that the statute of 1903, having been found for the purpose of executing treaties, must be regarded as expressing the only effect which Congress intended they should have to the extent of the subject-matters to which the act relates. It re-enacts section 4887 in such form as Congress desired, faithfully omitting such parts of the convention of 1900 as referred to patents existing at the time it went into effect, or as referred to newly adhering states."

Under the authorities, except perhaps the opinion of Judge Archbald in Hennebique Construction Company v. Myers, 172 Fed. 869, 97 C. C. A. 289, the rule is well settled that the Treaty of Brussels did not affect the life of a patent issued in this country where a foreign patent had been first granted. The opinion of Judge Archbald is conceded to be not the opinion of the Court of Appeals for the Third Circuit. Union Typewriter Company v. L. C. Smith & Bros. (C. C.) 173 Fed. 288, 298, 299. Nor was the life of the domestic

patent in such case extended by the act of 1903. This is deemed satisfactorily demonstrated by the reasoning in the following cases, viz.: Sawyer Spindle Co. v. Carpenter, 143 Fed. 976, 75 C. C. A. 162; Shoe Co. v. Shoe Co., supra; Malignani v. Hill-Wright Elec. Co., supra; Malignani v. Marsh Consolidated Electric Lamp Co., supra.

[3] Whether or not there is any patentable novelty in the apparatus patent in suit seems extremely doubtful. The invention of the patent in suit was fully disclosed and claimed in the said expired British patent and died with it. The other questions raised in the record need not be considered at this time.

In the judgment of the court, even were infringement shown, which, in the judgment of the court, is not the case, there existed at the time of filing the bill no right of action in complainants.

The bill is therefore dismissed for want of equity.